

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0727-10

**LARRY JOSEPH TILLMAN, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

**HERVEY, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

Appellant, Larry Joseph Tillman, was charged with capital murder. TEX. PENAL

CODE §§ 12.31(b), 19.03(a)(2). A jury found him guilty, and the trial court assessed the

automatic punishment of confinement for life in the Institutional Division of the Texas

Department of Criminal Justice. The Fourteenth Court of Appeals affirmed. *Tillman v.*

*State*, No. 14-08-00846-CR, 2010 Tex. App. LEXIS 4013 (Tex. App.—Houston [14th Dist.] May 27, 2010) (memo. op., not designated for publication). We granted discretionary review to address whether the eyewitness-identification expert testimony was relevant. We will reverse the judgment of the court of appeals.

## I. FACTS AND PROCEDURAL HISTORY

On the night of December 21, 2005, the victims, Amandre Wilson and Joseph Liebetreu, returned home after attending a charity ball. Ricardo Avila, who lived across the street from Wilson's town home, was in his kitchen just after midnight when he heard two gunshots from the direction of the victim's home. As he ran towards the front of his house to look across the street, Avila heard Liebetreu yell, "Hey, you, get out of here." He then heard two more shots. Avila saw an "extremely tall" black man run out of the victim's front door. The suspect was wearing a black, mid-thigh length coat and a gray knit cap. Avila testified that the lights of the victim's front porch and garage were working, as was the street light, so he could see the suspect's face.[1] The suspect did not have any facial hair. On cross-examination, Avila estimated that he was about 62 feet away from the suspect when he viewed him. Avila went to a neighbor's house and called 9-1-1. Later that morning, Avila gave a sworn witness statement to the police, and on January 17, 2006, he assisted the police in making a composite sketch of the suspect, which was then published on a newscast.

---

[1]Witness Avila testified that as a teacher and a barber, he is accustomed to observing faces and remembering their features.

Dan Christoffel lived in the same town-home complex as Wilson. While his brother was driving him down the street, Christoffel witnessed a tall black man who appeared to have been running away from the victim's home, slowing when he saw the car's headlights. Christoffel described the man as having a baby face and wearing a knit cap and a dark, long, thigh-length coat. Christoffel passed within four to six feet of the suspect, and the two made eye contact. Christoffel submitted a sworn witness statement that morning.

Bobby Williams testified at trial that he was at an apartment talking to some people when three black males came into the apartment. This was shortly after the victims were murdered. Williams saw and heard one of these individuals, a "big guy," discussing how he had murdered the victims.[2] A few hours later, Williams called Crime Stoppers.

On February 23, 2006, Williams "tentatively" identified Appellant to a couple of police officers while they were driving around Appellant's neighborhood in an unmarked police vehicle. Subsequently, the investigating officer, Xavier Avila, prepared a photo spread containing Appellant's photograph. On February 24, witnesses Avila and Christoffel viewed a total of six separate photo spreads, each with photographs of six

---

[2]Williams testified that he overheard the "big guy" discussing that the victims, who had been dressed in ballroom clothing, looked like "easy picks." The "big guy" explained that he was prevented from attacking the couple in the garage, so he went to the front door and rang the bell. When Wilson would not open the door fully, the "big guy" forced his way in. Wilson fought back, so he shot her. He then shot Liebetreu, who had seen his face. Williams also described some of the items that the three males pulled from a garbage bag, including a purse, jewelry, and presents wrapped with Christmas paper.

persons (for a total of 36 persons). Neither witness was able to identify Appellant as the person they saw running from the victim's home on the night of the murder, even though Appellant's picture was in the last photo spread they viewed (State's Exhibit 74). That day, Williams picked Appellant out of the same photo spread (State's Exhibit 74). Williams testified that Appellant was the one he saw and heard in the apartment discussing how he had murdered the victims.

Twelve days later, on March 8, witnesses Avila and Christoffel separately viewed a five-person live lineup. Officer Avila described the lineup at trial. He stated that Appellant was in the number one position, and Appellant was the only individual in this live lineup who was cleanly shaven. Appellant was also the only one in the live lineup from the previous six photo spreads that had been viewed by the witnesses previously. Witness Avila positively identified Appellant. Christoffel "tentatively" identified Appellant from the lineup—he stated that either Appellant or the number two person in the live lineup was the person he saw and that he "felt confident that No. 1 was the person based on his face." Christoffel testified at trial:

> Q. [STATE]: And did you talk to [a police officer] about the individuals that you saw in the lineup?
>
> A. [CHRISTOFFEL]: Yes.
>
> Q. And do you recall what you said?
>
> A. Yes, that the second, No. 2, the second individual with regard to height, I felt like that was the individual. But with regard to the face, I really thought, my gut feeling was the guy is No. 1, or I felt confident, not a

hundred percent, but I felt confident that No. 1 was the person based on the face. But the height made it to where I said one or the other.[3]

Officer Avila suggested that there was nothing unusual about the identification procedure used with witnesses Avila and Christoffel:

> Q. [STATE]: When you showed [State's Exhibit 74] to [Avila], he was not able to identify anyone from the photos?
>
> A. That's correct.
>
> Q. Is that unusual?
>
> A. No.
>
> * * *
>
> Q. Well, have you done many photospreads and lineups over the years?
>
> A. Hundreds.
>
> Q. And do you find it's easier for people to recognize someone live when they can see their full body than in a flat, one-dimensional photo?
>
> A. Yes.
>
> * * *
>
> Q. And is it fairly common that individuals can't identify someone from a photospread, but can identify them live?
>
> A. That's correct.

The defense responded to this during cross-examination by emphasizing some of the suggestive aspects of the identification procedure:

> Q. In regard to the sequence of the photo arrays that you've prepared and then the lineup in this case, in every instance you showed the witnesses a photo array, before you showed them the lineup in which [Appellant] was placed, correct?

---

[3]Officer Avila testified that he considered this to be a "tentative" identification.

A. Yes, sir.

Q. And sometimes it was only a matter of days after you showed them the photo array that had [Appellant's] photograph in it and when you showed the lineup with [Appellant] in it, correct?

A. It was . . . .

&ast; &ast; &ast;

Q. . . . I'm talking about the photo array that you showed witness Avila, witness Christoffel and also another witness by the name of Coy. You remember that?

A. Yes, sir.

Q. In which you showed them a photo array in which [Appellant's] picture was one of the six people?

A. Yes, sir.

Q. And none of them could pick him out, right?

A. Correct.

Q. And a few days after that you put [Appellant] in a lineup with four other people?

A. Well, they viewed it. The photospread was viewed by those witnesses that you described on the 24th, and the lineup was held on March 8th.

Q. All right. So 28 days in February, that's four. It's 12 days later; 12 days later you showed the lineup with [Appellant]?

A. Yes, sir.

Q. Now none of the other people that were in the photo array that you've shown him on the 24th of February was in the lineup besides [Appellant], correct?

A. Correct, yes, sir.

Q. [Appellant] was the only one whose photograph you had shown these witnesses some 12 days earlier when he could not identify him that was in that lineup?

A. That's correct.

Officer Avila also testified that a videotape of the lineup was shown to Christoffel's brother, who said he thought the suspect could either be the man in the third or fourth position. On re-direct, Officer Avila explained that he did not really expect the brother to be able to identify anyone since he was driving that night and his focus was on that task.

Appellant proffered the testimony of Dr. Roy Malpass as an expert on eyewitness identifications, and the trial court conducted a hearing outside the presence of the jury. Throughout the gatekeeping hearing, Malpass emphasized that he was not there to render an opinion about the accuracy of any particular witness's testimony. Nor did he intend to tell the jury about the specific lineup or photo spread used. Instead, he was to discuss the manner in which the lineup and photo spread were employed. For example, he proposed to testify "[t]hat the use of a photospread prior to gaining identification in a, in a physical lineup is a biasing fact against the Defendant." Similarly, defense counsel stated that he did not intend to ask Malpass specifically about the testimony of Officer Avila. Rather, it "expected to put those questions to [Malpass] as hypotheticals without reference to whether or not he had heard the testimony."

On direct examination, Malpass testified that he was a professor of psychology at

the University of Texas at El Paso, has researched eyewitness-related issues since 1969, and has conducted a number of experimental studies in the area. Malpass asserted that he leads the Eyewitness Identification and Research Laboratory at the university, which, at any given time, utilizes two to three Ph.D. students as well as several undergraduates in ongoing research. A number of scientists from other universities are involved in the laboratory's work too. Additionally, Malpass participated in the creation of the Department of Justice's publication entitled *Eyewitness Evidence, a Guide for Law Enforcement*, which was created to provide a set of guidelines for good practice in eyewitness-identification procedures to law enforcement throughout the United States. Malpass also stated that he is familiar with the literature in the area and is on the editorial board of one of the better journals in the field, *Law and Human Behavior*.

When asked if his area of psychology, the study of eyewitness identification, is a field of study, Malpass responded in the affirmative. He explained that it is an experimental science, using repeatable techniques and calculated error rates to test a working hypothesis. Additionally, Malpass stated that a community consensus among experts on the subject matter is achieved through peer review and surveys of those experts.

Malpass noted that he has conducted experiments using simulated crimes and testing eyewitnesses in the capacity of eyewitnesses to pick out suspects, and he has been on national television to discuss those experiments. He also explained that he is familiar

with scientific, psychological studies involving eyewitness procedures, including the use of photo spreads. Malpass stated that he heard the testimony of Officer Avila, and the type of photo spread used in this case is the same kind examined in the experiments he has studied. Malpass asserted that he has testified in a number of cases in Texas on similar matters, and although he has testified only for the defense in criminal trials and defendants in civil trials, Malpass has worked as a consultant for prosecutors, the federal government, and for defendants in both state and federal courts.

On cross-examination, Malpass acknowledged that he has never personally done studies where "there was a photo spread followed by a lineup," and that his "testimony has been disallowed several times by trial court judges in state criminal cases" because the trial court found his testimony either not relevant or not reliable. He also recognized that "there's one well-known researcher who flatly states that our knowledge is not sufficient for him to testify." However, on re-direct, Malpass stated that the same expert will never testify for the defense and testifies for the prosecution frequently.

On re-direct examination, Malpass testified that there are a number of people, including himself, who will not testify about certain issues simply because they believe that the scientific research is not sufficiently developed at this time. However, there are over 30 scientific studies involving the use of a photo spread in which no one is identified, followed by a live lineup in which only the target suspect was also in the photo spread. According to Malpass, those studies show that such a procedure is suggestive.

Q. [DEFENSE]: Now, on the issue of relevance, as a hypothetical, if someone is shown a photospread and cannot identify anyone and then a week or so later is shown a live lineup and only one person from that photospread is standing in that lineup; is that suggestive?

A. [MALPASS]: It certainly is.

Q. Does that increase the chance that the witness is not remembering who he saw at the scene, but he's instead remembering who he saw in the lineup [sic]?

A. That's right.

Q. Are there scientific studies on that issue?

A. Yes.

Q. How many do you suppose?

A. A little over 30.

Q. A little over 30. You haven't done those experiments yourself, have you?

A. No.

Q. But they are available in the scientific literature?

A. Yes.

Q. And you're familiar with them?

A. Yes.

Malpass also testified regarding identification procedures like those used with Williams.

Q. [DEFENSE]: Now with respect to a photospread if a witness is, hypothetically if a witness is driving or is being driven through a neighborhood by a police officer and says that–points out an individual, and says that that individual would seem to be the assailant and then is taken

back to the police station and shown a lineup with that person's picture in it, is that a suggestive procedure?

A. [MALPASS]: Certainly.

Q. Are there scientific studies about that kind of issue?

A. Not specifically about that particular configuration, but it is, it's under the topic of familiarity. It's a training study.

Q. Would you explain what that means?

A. Well, if you show a person a face one time, they're more likely to recognize that same face another time.

Q. Whether or not they remember that person from any actual conversation or the commission of any offense; is that right?

A. Well, whether the --

THE COURT: Sir, it calls for a yes or no answer.

Q. [DEFENSE]: Whether or not they - - in other words, it doesn't matter whether they actually saw the person commit an offense there, their memory is contaminated and they're identifying the person from what they've been shown.

A. Yes.

Malpass stated that these two types of identification procedures are "suggestive."

Q. Would those two identification procedures that I described, would they be approved by the standards of the U.S. Department of Justice Eyewitness Evidence Manual?

A. No.

Q. Why not?

A. Because they're suggestive.[4]

Q. When you say "they're suggestive," what in language terms does that mean?

A. It means that there are some external factors apart from a particular memory from the witness' observation of the criminal event that points to the probable guilt of the suspect.

Q. All right. And that's dictated by the police procedures and not by the eyewitness' actual memories?

A. That's right.

In a later hypothetical, Malpass testified to the psychological effects on an

eyewitness of working with a sketch artist.

Q. [DEFENSE]: Is it possible that someone who participates in the creation of a caricature or cartoon of a possible perpetrator that the cartoon itself could affect the person's memory?

A. [MALPASS]: Yes, both the process of creating it and the process of viewing it subsequently changed the original memory in the direction of the appearance of the composite.

Q. So, that a person who may become much more certain about the identification after he's participated with the police artist, then that might contaminate whatever his original memory might be; is that true?

A. Yes, that can change their original memory for a number of things.

Q. Is the whole problem here that when these kinds of procedures that I've described in the hypothetical that you can't tell where the memory comes from, is that the problem; you can't tell if it came from the first photospread

---

[4]Malpass stated that the pertinent procedures would not be approved by the standards of the U.S. Department of Justice's Eyewitness Evidence Manual due to their suggestive nature, but in later questioning, he could not locate this in the materials—"there are a number of things that dance around the topic, but it doesn't say that specifically."

or the actual viewing at the scene of the crime?

A. That's right, and the witness is not aware of the disassociation in their memory.

A final hypothetical addressed the suggestiveness of a lineup in which only one individual has a particular physical characteristic.

Q. [DEFENSE]: . . . Now let me ask you one other hypothetical that I neglected to ask. In your studies on lineup procedures, would it be, would it be a suggestive factor if a suspect was described as having facial hair and he was put in a lineup with five other fill-ins who did not have facial hair? Would that be suggestive for that witness?

A. [MALPASS]: It would not be an appropriate lineup.

Q. It would not be an appropriate lineup, and why is that?

A. Because it's suggestive. It calls attention to the one individual.

On re-cross examination, the State inquired about why a jury needs an expert to be told that these identification processes were suggestive, and Malpass replied that there are studies showing that jurors do not understand eyewitness identification completely and do not know how to apply what they do know to a particular case. When questioned about the general studies to which he had referred, Malpass stated that they are conducted with a wide range of conditions (for example, often staging crimes with varying degrees of distraction), and he explained via example that the conditions are manipulated in order to focus on various, isolated factors. The State then asked Malpass to describe the most reliable study that he knows. In response, Malpass detailed a study in which a crime was staged in front of about 350 people in a lecture hall, and then law enforcement

interviewed the viewers and conducted live lineups. Questionnaires were also distributed

that asked about the viewers' personal reactions to the events. According to Malpass, the

viewers, like jurors, did not seem to "spontaneously" understand what was a fair lineup

procedure and what was not. Malpass later explained that a witness uses the same mental

processes in a lab experiment as in the real world, so the results of the relevant studies

could be translated into real life, real crime scenarios.

During subsequent questioning, Malpass denied that he was asleep during Officer

Avila's testimony. He maintained that his attention did not waver while the officer was

on the stand. A deputy did approach him while a supervisor from the Houston Police

Department was on the stand but not when Officer Avila was testifying. Still, Malpass

stated that he was not present during the testimony of witnesses Avila and Christoffel.

The trial court decided that Malpass would not be permitted to testify before the

jury. In excluding Malpass's testimony, the trial court made this ruling:

> [TRIAL COURT]: First of all, for the record, he did state he was not
> present for the testimony of the eyewitnesses in this case. He has not done
> studies regarding a lineup procedure following a photospread, although he
> stated that it was in the document that you have quoted when given, I think
> it was about six minutes to find it, he finally stated it's not in there. He's
> not done a study on the factors that he intended to testify about today; he
> personally stated that. He also said that he's not done any studies on seeing
> a defendant and then a photospread later.
>
> There is no doubt in my mind that his testimony about not sleeping is just
> not true. I saw him seated at the back of the courtroom with his head down
> appearing to nod off several times during the course of the trial. It's one of
> the reasons that I approached Counsel and said perhaps he should be in the
> hall. I was then told that it was imperative for his testimony that he see all

of this.

> Deputy Kaminski had to go, and as the Doctor was seated directly in back of the courtroom from me where I could see him, and obviously the attorneys trying the case could not see him I am certain because your focus is this way. But I had a vantage point where I could see that his head was down. Deputy Kaminski went up and approached him explained that, he approached him so that the Doctor could see his feet if he were not asleep and then would respond, and Deputy Kaminski had to prod him twice to wake him up.

> I do not find, first of all, based on that and the trouble that this entire county has endured for over 20 years over a lawyer sleeping in court that I can in good conscious [sic] say that an expert who sleeps in court has availed himself of testimony deemed relevant to his determination and his opinion to be able to render that opinion. I also find that the opinion that he has spoken of will not be relevant. So, I will not, for those reasons, allow his testimony.

Other witnesses who testified at trial included policemen and investigating officers involved in the case, the first paramedic and the first police officer to arrive at the scene, a shoe-print and tire-tread examiner from the FBI, a forensic consultant, a firearm examiner, a Harris County medical examiner, a forensic artist, a retail analyst, Appellant's former cellmate, Wilson's brother, and Liebetreu's co-worker.

During its deliberations, the jury sent out two notes. One note asked "to see the artist sketch drawn with the description provided by [Officer Avila]" and to "provide the [post-arrest] picture that the prosecuting attorney showed the jury during final arguments" of Appellant. The other note asked for "the VHS tape that [the police] took of the outside of the [victim's town home] revolving around to [witness Avila's] house across the street." Ultimately, the jury found Appellant guilty of capital murder, and the trial court

assessed the automatic punishment of confinement for life in the Institutional Division of the Texas Department of Criminal Justice.

## II. FOURTEENTH COURT OF APPEALS

Appellant argued on direct appeal that the trial court erred in excluding Malpass's testimony.[5] The Fourteenth Court of Appeals disagreed and affirmed the judgment of the trial court. *Tillman*, 2010 Tex. App. LEXIS 4013, at *7-12. It stated that, to be relevant, expert testimony must make the effort to tie pertinent facts of the case to the scientific principles. The court asserted that Malpass had no knowledge of the facts of this case and made no effort to connect his opinion with those facts. As a result, his testimony would not help the jury understand the evidence or determine a fact in issue, and the court determined the trial court's ruling was within the zone of reasonable disagreement.

We granted Appellant's petition for discretionary review to address whether the court of appeals erroneously decided that the trial court properly excluded the eyewitness-identification testimony of Appellant's proffered expert (Malpass) because the psychologist "demonstrated no knowledge of the facts of this case and made no effort to connect his opinion with those facts." *See id.* at *12.

## III. ARGUMENTS OF THE PARTIES

### A. Appellant's Argument

Appellant argues that the court of appeals improperly excluded Malpass's

---

[5]Appellant raised a total of six issues on appeal, and the court of appeals overruled each. *Tillman*, 2010 Tex. App. LEXIS 4013, at *7-43.

testimony because it was indeed relevant and reliable as it satisfied the three requirements of *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), for "soft sciences."

Appellant reasons that courts have recognized that there is a place for experts in the area of eyewitness identification in criminal trials. He asserts that Malpass is qualified as an expert in that field and the subject matter that he proposed to discuss is within the scope of that field. In addition, he contends that Malpass's testimony was aimed at the very procedure used in this case. Malpass was familiar with the identification procedure at issue, and his proposed testimony would explain the general suggestiveness of the specific type of identification procedure used here. Appellant points out that at least thirty studies backed up Malpass's testimony. Further, Malpass's testimony would be helpful to the jury because jurors really do not fully understand eyewitness identification and the possible bias of an incorrect procedure.

According to Appellant, when Malpass sought to discuss the suggestive nature of the specific identification process used in this case, he proposed to do nothing more than what other experts are allowed to do everyday, testify in the hypothetical. Appellant analogizes this situation to child-abuse cases in which experts are allowed to testify about "delayed outcry syndrome." In such cases, the experts do not claim to know whether that syndrome was in play in any given case, but the testimony is helpful to the jury and typically permissible.

**B. State's Argument**

The State responds that Appellant has failed to prove that Malpass's testimony was relevant and reliable. The State concedes that Malpass proved to be a psychologist through profession and he assisted the Department of Justice in publishing literature on eyewitness evidence, but it maintains that that is the only evidence proffered to support his expertise in the area of eyewitness identification. The State notes that Malpass admitted this was not a study conducted or observed by himself but rather something about which he had read. The State suggests that it cannot be gathered what principles of psychology Malpass might have relied upon during his eyewitness-identification testimony. He cited no books, articles, journals, or names of psychologists who practice in this area—he provided only "generic testimony" and "general studies."

The State also notes that, to be relevant, Malpass's expert testimony must assist the trier of fact to understand and determine a fact in issue. According to the State, Malpass "demonstrated no knowledge of the facts of this case and made no effort to connect his opinion with those facts." The State asserts Malpass only knew that there was a lineup shown after a photo spread; he knew nothing about the specifics of the case and had not spoken to any witnesses. The State distinguishes this case from *Jordan v. State*, 928 S.W.2d 550 (Tex. Crim. App. 1996). In *Jordan*, the expert had been told the facts of that case, applied the theories to specific facts, and explained how they might undermine the reliability of the respective eyewitness identification. But here, the State argues that Malpass did not exhibit knowledge of specific facts of the case or tie the scientific

principles on which he sought to testify to the facts of this case, other than to postulate generally. Thus, Appellant has not demonstrated that Malpass's testimony would "assist the trier of fact" or was "sufficiently tied" to the pertinent facts of the case.

## IV. ANALYSIS

A trial judge's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement. *Davis v. State*, 329 S.W.3d 798, 813-14 (Tex. Crim. App. 2010); *Russeau v. State*, 291 S.W.3d 429, 438 (Tex. Crim. App. 2009).

Here, the evidence at issue is the testimony of eyewitness-identification expert Malpass. Admission of expert testimony is governed by Rule 702 of the Texas Rules of Evidence, which states,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid. 702; *see Morales v. State*, 32 S.W.3d 862, 865 (Tex. Crim. App. 2000). For expert testimony to be admissible under this rule, the party offering the scientific expert testimony must demonstrate, by clear and convincing evidence, that such testimony "is sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). In other words, the proponent must prove two prongs: (1) the testimony is based on a reliable scientific foundation, and (2) it is relevant to the issues in the case. *Hartman v. State*, 946 S.W.2d 60, 62 n.4 (Tex. Crim.

App. 1997); *Jordan*, 928 S.W.2d at 555.

### A. Reliability[6]

The focus of the reliability analysis is to determine whether the evidence has its

basis in sound scientific methodology such that testimony about "junk science" is weeded

out. *Jordan*, 928 S.W.2d at 555. Expert testimony in the field of psychology pertaining

to the reliability of eyewitness identifications is a "soft science." *See Weatherred v. State*,

15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Consequently, to establish its reliability, the

proponent must establish that "(1) the field of expertise involved is a legitimate one, (2)

the subject matter of the expert's testimony is within the scope of that field, and (3) the

expert's testimony properly relies upon or utilizes the principles involved in that field."

*Id.*; *Nenno*, 970 S.W.2d at 561. This analysis is "merely an appropriately tailored

translation of the *Kelly* test to areas outside of hard science."[7] *Nenno*, 970 S.W.2d at 561.

---

[6]Although the court of appeals stated that "only the relevance of Dr. Malpass' testimony is at issue," the reliability of that testimony is very much in issue. Relevance and reliability are closely related, and the State and Appellant addressed both issues in their briefs to the court of appeals and to this Court.

[7]In *Kelly*, 824 S.W.2d at 573, we stated the following:
Factors that could affect a trial court's determination of reliability include, *but are not limited to*, the following: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

As such, the "general principles announced in *Kelly* (and *Daubert*[8]) apply, but the specific factors outlined in those cases may or may not apply depending upon the context." *Id.* at 560.

Here, Malpass was to testify about the reliability of eyewitness identifications. We believe that psychology is a legitimate field of study and that the study of the reliability of eyewitness identification is a legitimate subject within the area of psychology. Malpass explained that the study of eyewitness identification is an experimental science—it tests a working hypothesis using repeatable techniques that allow for the calculation of error rates. Universities and colleges, including the University of Texas at El Paso, have laboratories that focus on eyewitness identification, and there are published journals on the subject matter. In addition, those involved in the field are able to establish a consensus through peer review articles and surveys of experts.

Nationwide, 190 of the first 250 DNA exonerations involved eyewitnesses who were wrong. BRANDON L. GARRETT, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 8-9, 279 (2011). In Texas, reports indicate 80 percent of the first 40 DNA exonerations involved an eyewitness identification error. Innocence Project of Texas, *Texas Exonerations–At a Glance (2011)*, http://ipoftexas.org/index.php?action=at-a-glance.

In a recent opinion of the Supreme Court of New Jersey, *New Jersey v. Henderson*,

---

[8]*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

2011 N.J. LEXIS 927 (N.J. Aug. 24, 2011), the court focused on the reliability of an

eyewitness identification.[9]  The New Jersey court discussed the broad consensus within

the scientific community on the relevant scientific issues.  *Id.* at 113-15.  Specifically, the

court referred to the results of a 2001 survey of sixty-four experts, mostly cognitive and

social psychologists:

> Ninety percent or more of the experts found research on the following topics reliable: suggestive wording; lineup instruction bias; confidence malleability; mugshot bias; post-event information; child suggestivity; alcohol intoxication; and own-race bias. . . . Seventy to 87% found the following research reliable: weapon focus; the accuracy-confidence relationship; memory decay; exposure time; sequential presentation; showups; description-matched foils; child-witness accuracy; and lineup fairness."

*Id*. at 113-14 (citing Saul M. Kassin et al., *On the "General Acceptance" of Eyewitness*

*Testimony Research: A New Survey of the Experts*, 56 AM. PSYCHOLOGIST 405, 407

(2001)).  The Supreme Court of New Jersey went on to note that, in the ten years since the

Kassin study, the consensus that the study of eyewitness identification is a reliable field of

research has continued to grow.  *Id.* at 114-15.  And the court highlighted that law

enforcement and reform agencies throughout the country have taken note of the scientific

---

[9]After the State's petition for certification was granted and briefs were filed, the Supreme Court of New Jersey decided that the factual record on which to test the current validity of pertinent state law standards for eyewitness identification needed to be developed more fully. *Henderson*, 2011 N.J. LEXIS 927, at *33-34.  It therefore remanded the matter to consider the validity of existing eyewitness-identification case law in light of recent scientific and other evidence. *Id.* at *34.  The New Jersey court appointed a Special Master to preside over the remand hearing, and during the ten-day hearing, the Special Master heard testimony from seven expert witnesses, including Malpass (who was called by the State). *Id.* at *34-35.

community's findings, forming task forces and developing new procedures to improve the reliability of eyewitness identifications. *Id.* at \*115-21. Additionally, the United States Supreme Court recently granted certiorari on another case involving the reliability of eyewitness identification. *Perry v. New Hampshire*, 79 U.S.L.W. 3672 (U.S. May 31, 2011) (No. 10-8974).

Since the first two prongs of *Nenno* are satisfied, the issue becomes whether Malpass's testimony properly relied upon and utilized the principles involved in the relevant field of psychology. We believe that this standard has been met. Malpass's extensive resume reflects his status as a scientist and consultant in the field: he is a professor of psychology, he has researched eyewitness-related issues for over 40 years, he has conducted experiments in the area, he leads the Eyewitness Identification and Research Laboratory, he assisted the Department of Justice in creating a publication on eyewitness-identification procedures, he is on the editorial board of the *Law and Human Behavior* journal, and he has been on national television to discuss eyewitness-identification studies. Malpass used this extensive experience and knowledge to opine about the identification procedures in this case. He expressed familiarity with the literature and many relevant studies in the area and applied the relevant concepts to the hypotheticals presented.

The State contends that Malpass's testimony is not reliable because he provided only "generic testimony" and "general studies." Malpass's testimony involved more than

mere generalities.  In *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), we held that the expert testimony was not reliable because it was unclear what principles of forensic psychiatry the expert might have relied upon.  We pointed out that "he cited no books, articles, journals, or even other forensic psychiatrists who practice in this area," and "[a]lthough there is a significant body of literature concerning the empirical accuracy of clinical predictions versus actuarial and risk assessment predictions, [the expert] did not cite or rely upon any of these studies and was unfamiliar with the journal articles given to him by the prosecution."  *Id.* at 278-79.

The specific principles of psychology in the area of eyewitness identification relied upon by Malpass were sufficiently clear.  Although some references to studies and experts were of a general nature, Malpass articulately described specifics when asked to do so.  For example, he detailed the study in which a crime was staged in front of 350 people in a lecture hall, and he extensively commented on the pertinent conclusions resulting from that experiment.  Malpass also referenced over 30 scientific studies involving the use of a photo spread in which no one is identified, followed by a live lineup where only the target suspect is in both.[10]  He detailed the psychological explanations leading to the primary conclusion that such a procedure is suggestive, and he applied that learned knowledge to various hypothetical scenarios, describing his rationale clearly throughout.  Additionally, Malpass noted his participation in the creation of the

---

[10]Contrary to the State's assertion, it is not essential to a determination of relevance that Malpass did not conduct these particular studies himself.

Department of Justice's publication on eyewitness-identification procedures, and he articulated the psychological basis for its overall substance.  It is clear that Malpass relied upon and utilized the principles in the relevant area of psychology.  Therefore, we conclude that Malpass's testimony was reliable.

## B. Relevance

Relevance is "a looser notion than reliability" and is "a simpler, more straight-forward matter to establish."  *Jordan*, 928 S.W.2d at 555.  The relevance inquiry is whether evidence "'will assist the trier of fact' and is sufficiently tied to the facts of the case."  *Id.*  Hence, to be relevant, the expert "must make an effort to tie pertinent facts of the case to the scientific principles which are the subject of his testimony."  *Id.*  Upon examining his testimony, we hold that Malpass's proffered testimony is relevant because it satisfies those requirements.

In *Jordan v. State*, we specifically addressed the "fit" aspect of the relevance inquiry.  There, the proffered expert "answered questions about the specific facts of the case and how they might be affected by the factors he testified to," "stated his opinion about the reliability of the eyewitness identifications," and "identified facts in the case that he believed impacted those identifications."  *Id.* at 556.  However, the expert "did not testify about several factors that might have affected the reliability of the eyewitness identifications";[11] nor did he "interview the witnesses  or examine certain pieces of

---

[11]These factors included "the length of time appellant was viewed by the witnesses, the lighting conditions, [and] the physical descriptions of appellant initially given by the witnesses

evidence." *Id.* at 555-56. We held that, although the expert "did not testify as to every conceivable factor that might affect the reliability of eyewitness identification present," his testimony "was sufficiently tied to the facts to meet the simple requirement that it be 'helpful' to the jury on the issue of eye witness reliability." *Id.* at 556. We explained that the question under Rule 702 is "not whether there are some facts in the case that the expert failed to take into account, but whether the expert's testimony took into account enough of the pertinent facts to be of assistance to the trier of fact on a fact in issue." *Id.* Further, we noted that the expert's failure to account for some facts "is a matter of weight and credibility, not admissibility." *Id.*

Like the expert in *Jordan*, Malpass tied the relevant facts of the case to the scientific principles about which he testified. In fact, Malpass testified to a hypothetical set of facts that mirrored the procedure employed in this case.

During the gatekeeping hearing, Malpass discussed the psychology of eyewitness identification and how certain factors may contribute to disassociation in the eyewitness's memory. He explained his own studies conducted on the topic as well as other studies with which he was familiar (including 30 on the use of a photo spread in which no one is identified, followed by a live lineup in which only the target suspect was in the photo spread). Then, Malpass responded to a series of hypotheticals proposed by the defense, applying his knowledge of eyewitness identification to the facts presented. He answered

---

prior to viewing the photo lineup." *Jordan*, 928 S.W.2d at 555-56.

questions about each of these detailed scenarios and how they might be affected by various circumstances. Malpass stated his opinion about the reliability of the eyewitness identifications in each situation, and he identified the factors that he believed impacted those identifications.

Significantly, each hypothetical to which Malpass applied his theories and opinions paralleled the facts of this case and the scenarios in which the eyewitnesses found themselves. For example, one hypothetical mirrored the identification procedure by which witnesses Avila and Christoffel identified Appellant—it described a procedure in which a witness could not identify anyone in a photo spread, and then a week later, the witness was shown a live lineup, with only one person from the photo spread standing in that lineup. A later hypothetical corresponded to witness Avila working with a police artist to develop a suspect sketch, as it concerned the effects on an eyewitness of working with a police sketch artist. Still another hypothetical paralleled the identification procedures used with Williams—it described a drive-by identification of a suspect, followed by a live lineup. Finally, the last hypothetical concerned a live lineup in which only one individual had facial hair, and such facts are the opposite of what occurred in the live lineup viewed by witnesses Avila and Christoffel in which Appellant was the only individual who was cleanly shaven. Thus, it would appear that Malpass was familiar with the case or at least a procedure exactly like that employed in this case.

In all, Malpass's testimony was sufficiently tied to the facts of this case. Our

conclusion is not undermined by the fact that Malpass was not present during the testimony of witnesses Avila and Christoffel and possibly slept during some of Officer Avila's testimony. In *Jordan*, we disapproved of the court of appeals's emphasis on the expert's failure to interview the State's witnesses or examine the evidence at issue in the case. *Jordan*, 928 S.W.2d at 556 n.8. We explained that such requirements would be contrary to Rule of Evidence 703, which permits an expert to base his opinion testimony on the data and facts made known to him during trial. *Id.* (citing Tex. R. Evid. 703); *see also Ramey v. State*, No. AP-75678, 2009 Tex. Crim. App. LEXIS 124, at *44-45 (Tex. Crim. App. 2009) (not designated for publication) (stating that the rules of evidence do not require an expert to complete personal interviews in order to give an opinion about future dangerousness). Thus, it is sufficient that Malpass based his opinion on facts learned during his testimony. After all, Malpass responded to a series of hypotheticals, which mirrored the procedure used here and, thus, exposed the expert to the pertinent facts of this specific case.

Nor is our conclusion weakened because the facts of the case were presented to Malpass as hypotheticals. In *Jordan*, we noted that an expert can offer an opinion based solely on hypothetical questions posed at trial. *Jordan*, 928 S.W.2d at 556 n.8 (citing *Fielder v. State*, 756 S.W.2d 309, 320 (Tex. Crim. App. 1988)). And, although factually distinguishable, we believe that our reasoning in *Cohn v. State*, 849 S.W.2d 817 (Tex.

Crim. App. 1993),[12] is applicable here. In *Cohn*, we held that expert psychological testimony about the characteristics commonly displayed by child victims of sexual abuse was admissible. *Id.* As we articulated in a later case discussing the "fit" aspect of relevance, "witnesses other than the expert testified that the child victims in that case displayed some of the characteristics that the expert had testified were commonly displayed by child victims of sexual abuse, thereby linking the expert's generic testimony to the facts of that case." *Williams v. State*, 895 S.W.2d 363, 366 (Tex. Crim. App. 1994) (discussing *Cohn*). Here, Malpass went beyond what was sufficient under *Cohn*. While he testified to the general implications of eyewitness identifications, he also responded to detailed hypotheticals that paralleled the facts of the case. When placed in the context of other witnesses' testimony regarding the identification procedures employed, Malpass's testimony is sufficiently linked to the facts of the case.

The case at hand is distinguishable from other cases in which we have held that expert testimony is irrelevant on the grounds that it was not sufficiently tied to the facts of the case. *See, e.g.,Williams*, 895 S.W.2d 363; *Rousseau v. State*, 855 S.W.2d 666 (Tex. Crim. App. 1993); *Pierce v. State*, 777 S.W.2d 399 (Tex. Crim. App. 1989).[13] To

---

[12]In *Cohn*, a psychiatrist testified that child victims of sexual abuse often experienced "crying" and "angry" episodes, had problems concentrating in school, and tended to cling to parents to get reassurance. *Cohn*, 849 S.W.2d at 817-18. A number of other witnesses testified that the victims were withdrawn, fearful, and clingy after the alleged acts of abuse. *Id*. at 818-19.

[13]In *Jordan*, we cited to these cases, noting that the relevance inquiry will not always be satisfied. *Jordan*, 928 S.W.2d at 555.

illustrate, in *Rousseau*, the expert testimony failed to satisfy the relevance inquiry. *Rousseau*, 855 S.W.2d at 686.  The psychologist stated that he was going to testify that eyewitness identification is flawed, and he referred only to general "studies" and abstract concepts.  *Id.*  He did not discuss, and was not questioned regarding, whether any factors about which he planned to testify would apply to the facts of the case.  *Id.*  Similarly, in *Pierce*, the expert, a professor of psychology, discussed some concepts about eyewitness identification generally, but he could not say which scientific principles that he mentioned were applicable to the facts of the case and, if applicable, to what extent they would undermine the witnesses' testimony.  *Pierce*, 777 S.W.2d at 414-16.  Thus, the expert failed to fit his testimony to the facts of the case.  *Id.*

Indeed, *Daubert* itself illustrates why the testimony in this case "fits" for relevance purposes.  *Daubert* created the "fit" analysis to meet Rule 702's "helpfulness" standard, which "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  *Daubert*, 509 U.S. at 591-92.  The Supreme Court noted that this necessary connection "has been aptly described by Judge Becker as one of 'fit.'"  *Id.* at 592.  The case where Judge Becker created the "fit" description was, like this case, a situation where the defense proffered eyewitness-identification expert testimony.  *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985).  In that case, the expert on eyewitness identification sought to testify that cross-racial identifications often result in misidentifications; however, there was no evidence that a cross-racial identification had

actually occurred. *Id.* at 1242. Therefore, the testimony did not "fit" because it concerned a hypothetical event that had not occurred in that particular case.[14]

In contrast to the experts in those cases, Malpass did more than generally postulate or simply discuss the general concepts and theories surrounding eyewitness identification. Malpass applied those scientific principles and theories to detailed hypotheticals, and he addressed how various factors in eyewitness-identification processes can contribute to dissociation in eyewitnesses. And of crucial note, those hypotheticals mirrored the facts of the case, thus making his principles and theories applicable to the relevant facts. Hence, Malpass went beyond the general testimony of the experts in *Rousseau* and *Pierce* to sufficiently fit his testimony to the facts of this case.

In addition to being sufficiently tied to the facts of the case, we believe that Malpass's testimony would assist the trier of fact.[15] "[A] trial court need not exclude expert testimony when the general subject matter is within the comprehension of the average juror, as long as the witness has some specialized knowledge on the topic that will 'assist' the jury." *Coble v. State*, 330 S.W.3d 253, 288 (Tex. Crim. App. 2010). Thus, "[t]he question under Rule 702 is not whether the jurors know something about this subject, but whether the expert can expand their understanding in a relevant way." *Id.*

---

[14]That the facts of *Downing* are so similar to this case makes it especially helpful to contrast the *Downing* expert's ill-fitting testimony with Malpass's proposed testimony.

[15]We emphasize that we do not believe that an eyewitness-identification expert would necessarily assist the trier of fact in every case.

Over forty years ago, the United States Supreme Court stated that the "vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade*, 388 U.S. 218, 228 (1967). Since then, eyewitness identification has continued to be troublesome and controversial as the outside world and modern science have cast doubt on this crucial piece of evidence. As Malpass pointed out in his testimony, eyewitness identification that is not properly conducted is a major factor behind wrongful conviction. The Supreme Court of New Jersey has articulated its concern for the current state of eyewitness identification:

> [A] vast body of scientific research about human memory has emerged. That body of work casts doubt on some commonly held views relating to memory . . . Study after study revealed a troubling lack of reliability in eyewitness identifications. From social science research to the review of actual police lineups, from laboratory experiments to DNA exonerations, the record proves that the possibility of mistaken identification is real. Indeed, it is now widely known that eyewitness misidentification is the leading cause of wrongful convictions across the country.

*Henderson*, 2011 N.J. LEXIS 927, at *14-16.

Awareness and concern surrounding mistaken identifications and wrongful convictions has impacted the public to the point where it has become an obvious concern in jury selection. In our recent capital opinion, *Davis v. State*, 313 S.W.3d 317, 344 (Tex. Crim. App. 2011), one veniremember expressed, "I don't see how you can put someone to death or, you know, say life imprisonment, when you hear all the time of cases that are overturned for, you know, DNA or whatever." Similarly, in *Chanthakoummane v. State*, No. AP-75,794, 2010 Tex. Crim. App. LEXIS 249, *33, 35 (Tex. Crim. App. April 28,

2010) (not designated for publication), another veniremember stated, "I was disturbed by what has gone on in Dallas County with all the convictions being overturned," and this idea was repeated during later questioning.  Responding to these national and state concerns, the Texas Legislature has recently passed a new statute to address the improvement and standardization of photograph and live lineup identification procedures. TEX. CODE. CRIM. PROC. art. 38.20 (enacted by Acts 82nd Leg., ch. 219 (H.B. 215), § 1, effective September 1, 2011).

Therefore, while jurors might have their own notions about the reliability of eyewitness identification, that does not mean they would not be aided by the studies and findings of a trained psychologist on the issue.  *See Jordan*, 928 S.W.2d at 556. Additional explanation of eyewitness-identification theories may help guide the jury in its understanding of the standards in the area.  Malpass's background and experience have focused on the study of eyewitness identification, and he testified that research reveals that jurors do not understand eyewitness identification completely and do not know how to apply what they do know to a particular case.  As Malpass explained, his expert testimony was intended to educate the jury about an area in which it lacked a thorough understanding so that it might comprehend some of the complications that may arise.

More importantly, since the State was allowed to inform the jury, via Officer Avila's testimony, that there was nothing unusual about the identification procedures in this case, Malpass's testimony was necessary to provide the jury with a more balanced

picture of the reliability of these procedures. We understand the abuse of discretion standard and hesitate to second guess the trial court in these decisions. We also believe that an eyewitness-identification expert will not necessarily assist the trier of fact in every case. However, the jury in this case should have had the benefit of Malpass's testimony here because eyewitness identification was crucial to the State's case, and regardless of the suggestions made by the State, we believe that the identification procedure employed (in particular that used with witnesses Avila and Christoffel) was not usual. A total of six separate photo spreads were shown to the witnesses, each showing six persons. Appellant was in the last of the photo spreads. Neither witness could identify Appellant in the six photo spreads. Just twelve days later, the witnesses viewed a live line-up. Of the five individuals in the lineup, Appellant was the only one who had been in the previously viewed photo spreads, and Appellant was the only one who was cleanly shaven. Witness Avila identified Appellant, but Christoffel could only tentatively identify him. This procedure was out of the ordinary, as it involved many layers of suggestiveness. Consequently, in this case, it was imperative that the jury be exposed to the full spectrum of possible implications resulting from that suggestiveness in order to have a full understanding of the subject.

It is not for us to substitute our judgment for that of the trial court in determining abuse of discretion, but rather, we must determine whether the trial court has made a decision that is outside the zone of reasonable disagreement. *Dixon v. State*, 206 S.W.3d

587, 590 (Tex. Crim. App. 2006). We therefore hold that the trial court abused its discretion when it excluded reliable, relevant evidence that would "assist the trier of fact" by increasing the jurors' awareness of biasing factors in eyewitness identification. Malpass's testimony could have aided the jury by either validating or calling into question their own inclinations.[16] *See Jordan*, 928 S.W.2d at 556. If a juror's common-sense beliefs about certain factors were to be called into question by Malpass's testimony, the juror would be prompted to reconsider preconceived notions that he might otherwise have been unaware of when reviewing the facts of the case. *See id.* On the other hand, if a juror's preconceived notions were confirmed by Malpass's testimony, the juror could proceed with a greater level of confidence. *See id.* This increases confidence in the legal system and upholds the tenets of fair play while assisting the trial court in its proper gatekeeping function as provided by the Texas Rules of Evidence.

In conclusion, Malpass's testimony is reliable and relevant, and the court of appeals erred in holding otherwise. We reverse the judgment of the court of appeals and remand this case to that court for a harm analysis.

Hervey, J.

Delivered: October 5, 2011
Publish

---

[16]For example, "[e]veryone knows, for instance, that bad lighting conditions make it more difficult to perceive the details of a person's face. Some findings are less obvious. Although many may believe that witnesses to a highly stressful, threatening event will 'never forget a face' because of their intense focus at the time, the research suggests that is not necessarily so." *Henderson*, 2011 N.J. LEXIS 927, at *108-09.