49,474-05

RECEIVED IN
COURT OF CRIMINAL APPEALS
NOV 05 2015
Abel Acosta, Clerk

IN THE

COURT OF CRIMINAL APPEALS

AUSTIN, TEXAS

Ex parte                          §

Valentin Moreno, Jr.,             §          Writ No. 49,474-05

Applicant                         §

## APPLICANT'S OBJECTIONS TO THE TRIAL COURT'S FINDINGS OF FACT, CONCLUSIONS OF LAW, RECOMMENDATION AND ORDER

TO THE MOST HONORABLE COURT OF CRIMINAL APPEALS:

COMES NOW, Valentin Moreno, Jr., Applicant, Pro Se in the above referenced cause, and respectfully files 'Applicant's Objections To The Trial Court's Findings Of Fact, Conclusions Of Law, Recommendation And Order'. In support, thereof, the Applicant would show the following:

## I.
## JURISDICTION

This most Honorable Court posses exclusive habeas corpus jurisidiction over the parties and subject-matter, herein, pursuant to Chapter 11 in the Texas Code of Criminal Procedure Ann. (Vernon 2015).

## II.
## STATEMENT OF CURRENT FACTS

1. Applicant filed a successive application for a writ of habeas corpus, on June 15, 2015. Therein, challenging a jury's guilty verdict for the offense of Capital Murder, under a claim of actual innocence.

2. The Attorney Representing the State, filed the State's Original Response and Answer, on July 8, 2015.

3. The trial Court adopted, the State's proposed "Findings of Fact, Conclusions of Law, Recommendation and Order", on June 20, 2015.

4. The successive application, was received and presented to this Honorable Court, on Spetember 22, 2015. Where it is currently pending.

Page 1.

# III.
## STANDARD

Applicant's application is a successive writ of habeas corpus, therefore, in order for review and consideration of the merits of applicat's claims, he must first overcome Section 4, Article 11.07 of the Texas Code of Criminal Procedure. To do so, Applicant must met the "fundamental miscarriage of justice" exception in Section 4(a)(2). Applicant is required to make a 'prima facie' showing of actual innocence, in order to demonstrate that the constitutional violations at his trial did, in fact, result in a miscarriage of justice; 'the conviction of one who is innocent'. See; Ex parte Brroks, 219 S.W.3d 396, 401 (TCCA 2007).

"A credible claim of actual innocence serves to bring the applicant within the "narrow class of cases" implicating a fundamental miscarriage of justice." In other words, showing actual innocence by a preponderance of the evidence is a gateway through which a habeas applicant must pass in order to have his otherwise barred constitutional claims considered on the merits. Id at 400 (citing Schlup v. Delo, 513 U.S. 298, 315 (1995).

A credible gateway claim, requires reliable evidence that was not present at trial. And, Applicant's burden at the gateway 'stage', is to demostrate that more likely than not, in light of the new evidence no reasonable juror would find him guilty beyond a 'reasonable doubt'. To make such an assessment, the habeas court needs a fully developed record, and in respect to the Schlup inquiry, "must consider 'all the evidence, old and new'." Id at 327-328. [B]ecause a Schlup claim involves evidence the trial jury did not have before it, the inquiry requires the habeas court to assess how reasonable jurors would react to the "overall", newly supplemented record'. Emphasis added, a Schlup inquiry, requires a holistic judgment about "all the evidence", and its likely effect on reasonable jurors applying the reasonable doubt standard. House v. Bell, 547 U.S. 518, 126 S.Ct. 2064 (2006).

## IV.
### ARGUMENT

First, Applicant objects to the trial court's ruling, because the record is not fully developed, and there are controverted, previously unresolved facts, that are material to Applicant's Schlup claim and the legality of his conviction.

For example, Applicant argued, that before his trial the State contaminated the in-court-identification of State witness Beatrice Trevino, with suggestive and prejudicial post event information. (Note: Ms. Trevino recanted and admitted mis-identifying applicant, after trial.) The State's response, was that they did provide Ms. Trevino with the complained post event information, but only did so, after applicant's trial. See; State's Original Response and Answer, Pg. 5, Footnote 3. The "before" and "after" issue, therein, was never resolved by the trial court. Therefore, the trial court could not have adequately and justly enter a ruling, in regards to a Schlup inquiry.

Additionally, Applicant argued, the State mislead the jury with the scientific testimony of Dr. A.J. Alamia. Specifically, the testimony that conveyed to the jury that the 'human memory functions like a camera in traumatic events'. Applicant submitted credible scientific evidence, that showed, such testimony was misleading and incorrect. Again, the issue was never resolved.

Applicant objects to the trial court's Findings of Fact, Conclusions of Law, Recommendation and Order. Based on the habeas resord not being adequate and fully developed, for a Schlup inquiry. House v. Bell, 126 S.Ct. 2064 (2006).

### OLD AND NEW EVIDENCE

A Schlup inquiry requires the trial court, consider all the evidence, old and new. The evidence elicited and presented at trial by the State, consisted of three eyewitnesses (hereinafter, Ms. Gonzales, Mr. Guerrero and Ms. Trevino), and an expert on eyewitness identifications (hereinafter, Dr. Alamia). The primary conviction

The evidence presented by the defense, consisted of alibi witnesses: Mr. Acosta, his wife Berta Acosta and their daughter Sabrina Molina.

(A)> At trial, Ms. Gonzales testified, that applicant was one of five shooters. She stated, that she did not know nor had she ever seen applicant before. But, that applicant was the shooter that had his face covered with a bandana and beanie, and she was a hundered percent positive about his "eyes".

(New Evidence)> First, Applicant presented Ms. Gonzales' affidavit, therein, she recants her in-court-identification of the applicant and admits, to having mis-identified him. Additionally, she states, that detective Buenrostro provided her with information about applilcant being a member of the same gang suspected responsible for the shooting; Second, ballistic expert Max Scott determined, that Ms. Gonzales' version of the shooting was misleading and not true. It is significant to Note, that where the shooters were standing before and during the shooting, was instrumental and essential to the basis of the opportunity Ms. Gonzales got to view the alleged shooters faces. Also, the ballistic expert determined, that the store attendant's (Dolores Martinez) version of the shooting had the most reliability and accuracy, based on the expert's interpetation of the physical evidence. Note: Mr. Martinez version of the shooting, severely contradicted Ms. Gonzales' version; on number of weapons, the kind of weapons, number of shooters, number of perpetrators, how and where shooting happend, and discription of perpetrators. Third, forensic optometry specialist Dr. Paul Michel. determined, that Ms. Gonzales' identification of applicant's "eyes", was 'blatantly invalid'. Fourth, suggestive post event information can influence and contaminate a witness' memory. According to the scientific evidence presented. Finally, "now" from a scientific and legal stand point, it is acknowledge and accepted the the human memory is malliable. And, 75 percent of all wrongful conviction, are the result of "mistaken eyewitness identifications".

(B)> At trial, Ms. Trevino testified, that Valentin "Cat" Moreno (applicant) was of of four persons, that left in her nephew's car, and minutes after the car had left she heard alot of gun shots. She also stated, that applicant had an assault rifle when he got in the car.

After testifying for the State, Ms. Trevino approached defense counsel (Richard B. Gould and Norman E. McInnis) with a troubling disclosure. According to Ms. Gonzales, sometime before trial, she had confessed to the prosecutor (Sofia Arizpe), that she believed she had made a mistaked and misidentified the applicant.

Page 4.

And, in response, the prosecutor told her, that she was not making a mistake, because a witness that had been at the crime scene had stated the same ('had also identified the applicant'), and two witnesses at two different locations couldn't be wrong..."

Based on what Ms. Trevino had told them, the defense attorneys called her as their first witnesses. Therein, she testified about what she had told the prosecutor and what the prosecutor had told her in response. At she did not recant her earlier identification of the applicant.

After the trial, at a motion for new trial hearing, Ms. Trevino recanted and admitted having mis-identified the applicant.

(New Evidence)> First, Ms. Trevino's recantation after trial, she stated that she had confused applicant with Catarino "Cat" Herrera. After testifying for the State, Ms. Trevino stated that she had told the prosecutor, that she believed she made a mistake and mis-identified the applicant; "confusing him with Catarino "Cat" Herrera". And, that in response the prosecutor told her, that she was not making a mistake, because another witness had stated the same, and two witnesses couldn't be wrong. In regards to that, exchange, between witness and prosecutor, applicant presented scientific evidence on post-event information and post event misinformation (hereinafter PEI and PEM). Pursuant to that PEI and PEM scientific evidence, Applicant argued that the state influenced/contaminated Ms. Trevino's in-court-identification of him. Second, Ms. Trevino had testified that she knew applicant by the nickname "Cat", from her job as a security guard at PSJA High. Applicant presented, numerous affidavits from classmates, a principle and a youth probation officer, all of the stating, that applicant was not known by the nickname Cat. Note: Applicant and Mr. Herrera were bestfriends and break-dancing partners in middle and high school. And, on numerous occasions dressed alike. Third, Applicant has shown that detective Buenrostro had a personal bias against him. Ms. Trevino that when she gave her statement at the Sheriff's Office, she initially identified Catarino as Cat. At some point, detective Buenrostro showed her an individual picture of Applicant, and he became Cat, the suspect. Fourth, based on dectective Buenrostro's role in this case, today, under Article 38.02 of the Code of criminal Procedure, he wouldn't be allowed in the identification procedures. Finally, "now" from a scientific and legal stand point, it is acknowledged and accepted, that the human memory is malliable, especially, to suggestive PEI and PEM. And, that 75 percent of all wrongful convictions, are the result of "mistaken eyewitnesses".

Page 5.

(C)> At trial, Dr. Alamia testified, that in traumatic events the human memory functions like a camera; 'taking snapshots that stay ingrained in the memory'. In Closing Arguments, the prosecutor emphasized of Dr. Alamia's scientific testimony in a way, that bolstered and substantiated the testimonies of the prosecutions key witnesses.

(New Evidence)> First, the Applicant presented a report from the Innocence Project, which shows, that 75 percent of DNA exoneration cases, the principle cause of the erroneous guilty verdict, was "mistaken eyewitness identifications". Thus, proving the human memory does not work like a camera; Second, research from the scientific community (forensic psychology and neuroscience), has found that the human memory does not function like a camera or video recorder. (Note: This Court acknowledge the scientific community's latest finding and conclusion in these areas of science in Tillman v. State, 354 S.W.3d 425 (TCCA 2011)(citing, the unanimous decision, by the New Jersey Supreme Court in New Jersey v. Henderson, 208 N.J. 208, 2011 N.J. LEXIS 927 (N.J. Aug. 24, 2011). In addition to seven experts that testified at an evidentiary hearing, the court also considered a 2001 survey of sixty-four experts. The New Jersey opinion, was presented as an exhibit (exhibit A.1) in support of his application and memorandum); Third, an affidavit from psychology professor Dr. James Aldridge was also presented. According to Dr. Aldridge's, the scientific testimony of Dr. Alamia, was 'misleading and incorrect'. Fourth, On September 1, 2013, the Texas Legislature created Article 11.073 of the Code of Criminal Procedure. Mostly, because they acknowlege how incorrect science was responsible for erroneous guilty verdicts. Additionally, they grasp how science has changed. Today, Dr. Alamia's testimony that the human memory works like a camera, would be deem "Junk Science". Finally, during Applicant's trial, what is know today (an astranomical amount of data), was not known.

In regards to the foregoing (new evidence), the trial court only made the following finding:

> "Dr. Michel and Mr. Scott's affidavits merely challenge the credibility of the witness Yvonne Gonzales and do not make an affirmative showing of actual innocence. Similarly, the affidavit provided by Ms. Gonzales does not make an affirmative showwing of actual innocence. It merely that Ms. Gonzales is no longer as sure as she was at trial of her identification of Applicant."

Not only does Ms. Gonzales claim that she believes the applicant is innocent and she mistakenly identified him. Two experts, in two different fields, both deterimed that

her trial testimony was misleading, not true and invalid. In a nutshell, "Ms. Gonzales is claiming she made a mistake; 'mis-identified applicant'. A ballistic expert, is claiming that the ballistic related evidence, shows Ms. Gonzales' trial testimony was misleading and false. A forensic optemtry expert, finds that Ms. Gonzales' identification of applicant's "eyes", was 'misleading and invalid'." Applicant contends, that when all this new evidence is seen together, it raises alot more than just doubt...

Furthermore, Applicant add emphasis, that a Schlup inquiry requires the habeas court to consider "[a]ll the evidence, 'old and new'." The trial court did not some of the new evidence and none of the old evidence.

### OLD EVIDENCE

(a) The store attendant, did not testify, but he provided an eyewitness account to law enforcement, within minutes of the crime. According to Dolores Martinez's statements, thre were three guys, only two of them had weapons, other than one shot fired by the public phone, the shooting occurred as the truck was leaving, the two shooters were dark complexion and the other guy light complected with blondish hair. (Note: The applicant is light complected, but his hair has always been black. Also, according to ballistic expert Max Scott, based on the evidence, this was the best witness.);(b) Ociel 'Ozzy' Martinez was a suspect two days after the crime. Yet, the lead detective (Martin Trevino), determined, that Mr. Martinez was not involved and was at his home on the night of the crime. (Note: About a year later, Mr. Martinez in an affidavit alleged, that he was with Jose Garcia and Juanito Trevino when they committed this crime. Additionally, nine witnesses and Mr. Martinez himself, placed Mr. Martinez at the "get-together" that the shooters were at, minutes before leaving and commiting this crime. Five witnesses, claimed Mr. Martinez got in the car involved in the shooting. Further, Martinez's affidavit states, that the Applicant was not with them; (c) Numerous witnesses that were present at this "get-together", testified that the Applicant was not there; (d) According to the store attendant's sister, one of the detectives, told Mr. Martinez, that he could return to Mexico, because they would not need him as a witness; (e) According to two persons, when they were youths detective Joseph Buenrostro threatened them into signing false statements against

the applicant. (Note: The three witnesses in the primary case, only identified the applicant after being reinterviewed by detective Buenrostro.); (f) Mr. and Mrs. Acosta, their daughter all testified that applicant was at their home, at the time this crime occurred.

Applicant contends, that all the evidence he has presented, in the course of nineteen plus years, make a prima facie showing of actual innocence. Pursuant to the foregoing, Applicant respectfully objects to the trial court's Findings of Fact, Conclusions of Law, Recommendation and Order.

Additionally, based on the foregoing, the Applicant requests for an evidentiary hearing, so that the record can be fully developed and adequate for a Schlup inquiry.

## V.
## JUDICIAL NOTICE

Applicant respectfully asks this Honorable Court, to take Judicial Notice, of the New Jersey Supreme Court decision in the Henderson case. Specifically, the scientific issues discused there, are at the heart of Applicant's arguments and claims (e.g., Post Event Information and Post Event Mis-Information contamination, and the human memory not working like a camera.) See: Tillman v. State, 354 S.W.3d 425 (TCCA 2011).

## VI.
## CONCLUSION

This conviction was obtained through the eyewitness accounts of Raul Guerrero, Yvonne Gonzales and Beatrice Trevino, and eyewitness identification expert Dr. A.J. Alamia. No other evidence tied Applicant to this crime. Today, it would be held, that this conviction was obtained with the "[w]orse" kind of evidence, 'eyewitness identifications'. Two of the three witnesses mentioned above, have recanted and admitted having "mis-identified" the Applicant. One of those witnesses, Ms. Trevino had confessed to the prosecutor months before trial, that she believed she had mis-identified the Applicant. And, as for Ms. Gonzales, she claims she mis-identified

Page 8.

Applicant's "eyes". An identification of the 'eyes' that an optometry specialist determined to be invalid. Yet, even with other credible evidence supporting these two witnesses claim that they made a mistake and mis-identified the applicant, and with the fact, that mistaken identification account for 75 percent of all wrongful convictions. And, the strong evidence that shows the scientific testimony of Dr. Alamia, that was used to "bolster" and "substantiate" the testimonies, was misleading and incorrect. The trial court, recommends that applicant's application be dismissed.

Based on all the evidence and arguments, Applicant contends he has shown, that the [m]ajority of the evidence used to convict him, was misleading and incorrect. Additionally, Applicant has shown, that this conviction was obtained through many acts of prosecutorial misconduct and ineffective assistance of counsel. But, more importantly, Applicant has shown that his case, comes within the 'narrow class of cases' implicating a fundamental miscarriage of justice..... the incarceration of someone (Applicant) who is actually innocent.

For the foregoing reasons, Applicant respectfully objects to the trial court's Findings of Fact, Conclusions of Law, Recommendation and Order.

## VII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, the Applicant respectfully Prays that this most Honorable Court, accept his objection, herein, and remand the case back to the trial court: for an evidentiary hearing so the record can be fully developed and a new Findings of Fact, Conclusion of Law, Recommendation and Order. And, for the Court to grant any other relief deemed just and adequate.

Sigened on this _1st_ day of _November_ ,2015.

Respectfully Submitted,

Valentin Moreno, Jr.
Applicant, Pro Se
788216, Robertson Unit
12071 Fm 3522
Abilene, Texas 79601

Page 9.

## VERIFICATION

I, Valentin Moreno, Jr., hereby declare under the penalty of perjury, that the statements herein, are true and correct, and offered in good faith.

Sigened on this _/st_ day of _November_, 2015.

_Valentin Moreno, Jr_
Valentin Moreno, Jr
Applicant, Pro Se

## CERTIFICATE OF SERVICE

I, Valentin moreno, Jr., hereby certify that the original copy of Applicant's Objections to the Trial Court's Finding of Fact, Conclusions of Law, Recommendation and Order, were sent by U.S. certified Mail, to the Clerk of the Court Of Criminal Appeals, Austin Texas , and that notice of the same was sent to Hon. Michael Morris via U.S. 1st Class Mail.

Done on this _/st_ day of _November_, 2015.

_Valentin Moreno, Jr._
Valentin Moreno, Jr.