# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-10-00304-CR

Joseph Foley, Appellant

v.

The State of Texas, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. D-1-DC-09-301724, HONORABLE CHARLES F. BAIRD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Joseph Foley of five counts of aggravated robbery arising from a single criminal episode. *See* Tex. Penal Code Ann. § 29.03 (West 2011). Each conviction resulted in a sentence of sixty to eighty-five years' imprisonment, all sentences to run concurrently. Foley appeals, arguing that (1) the trial court erred by refusing to grant his motion for new trial because the State failed to disclose favorable, material evidence before or during trial; (2) the trial court erred by admitting expert testimony on gunshot-residue analysis because the State failed to establish that the testimony was reliable; and (3) the trial court violated the prohibition against double jeopardy by trying Foley for multiple counts of aggravated robbery involving a single victim. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The jury heard evidence that during the early morning hours of July 16, 2009, Foley and two accomplices, Abasi Price and Michael Cooper, invaded a house with the intention of robbing its occupants. Foley, Price, and Cooper were dressed in black, had their faces covered with bandanas, and carried multiple weapons including a baseball bat, a knife, and a gun. Upon entering the house, the men ordered its occupants to get on the floor. One of the occupants, James Barker, resisted, tackling one of the intruders and struggling with him until another intruder hit him in the head with a baseball bat. Two other occupants, Alvin Duran and Paul Linden, were also hit with a bat at some point. Another occupant, Andrew Chaney, fled out the back door and attempted to scale the back fence, but Price caught him and forced him to return to the house at gun- or knife-point.[1] After Price forced Chaney back into the house and ordered him to lie down, one of the intruders emptied Chaney's pockets and shot him in the hand. The intruders made the occupants stay on the floor, confiscated their cellular telephones, and ransacked the house looking for valuables. One occupant, Donald Lineberry, managed to escape the house undetected and ran to a nearby convenience store to call 911.

The first police officers to arrive at the house saw Price carrying a television out the front door. When Price saw the police he dropped the television and ran. Police eventually apprehended him on the roof of a neighboring home. Police saw a second suspect drop a camcorder, camera, and baseball bat while attempting to flee the scene. They recovered these items plus a bandana and a shoe a few houses away. Austin Police Department DNA analyst Elizabeth Morris

---

[1] There was conflicting testimony as to whether the weapon was a knife or gun: Chaney testified that he believed it was a gun, but Price testified that it was a knife.

testified that Foley could not be eliminated as the major contributor of the DNA on the bandana. Further down the street, police also discovered a black t-shirt and black gloves. Foley's DNA was found on the shirt, and one of the gloves tested positive for gunshot residue. Morris testified that neither Foley nor Cooper could be eliminated as the source of the DNA on the gloves.

Michael Stoll, who lived near the crime scene, testified that after the events in question he found a bundle of clothes in the bed of his truck. Inside the bundle he found two cellular telephones, a pair of blue gloves, and a handgun. Stoll turned these items over to the police. Subsequent testing revealed that the gun had fired a casing that was found at the crime scene.

During his post-arrest interrogation, Price identified Foley and Cooper as his accomplices. Price later called Foley from jail and told him to run because the police were looking for him. Foley and Price's employer, Chris Davis, testified that he went by Foley's house the morning of the robbery to offer Foley a ride to work, but Foley was not home. Foley later arrived at work on his own, roughly two hours late for his shift. Davis testified that later that morning he received a telephone call from Price, who told him that he was in jail and that the police were looking for Foley. Price then asked to talk to Foley, and Davis handed Foley the phone. Davis testified that when Foley hung up, he seemed upset. A couple of hours later, Foley told Davis that he had to leave work early. Davis warned him that he could be fired for leaving under such circumstances, but Foley shook his hand, said that he might not see Davis again, and left anyway.

The State eventually arrested Foley and charged him with sixteen counts of aggravated robbery. Before trial, the State elected to proceed on only six of the counts. The State charged Cooper and Foley using essentially identical indictments, and the two men proceeded to trial as co-defendants.

During trial, the victims of the robbery testified to the above events. Price also testified for the State. In addition, the State presented expert testimony from (1) Elizabeth Morris on the DNA evidence and (2) Juan Rojas on the gunshot residue found on a black glove near the crime scene. The probity and admissibility of this testimony was contested, but the court ultimately admitted it. At the close of the evidence, the State waived one of the six counts and proceeded on the remaining five: aggravated robbery involving bodily injury to Chaney; aggravated robbery involving threat to Chaney; aggravated robbery involving bodily injury to Barker; aggravated robbery involving threat to Barker; and aggravated robbery involving bodily injury to Linden. *See id.* The jury returned guilty verdicts on all five counts as to both defendants and, for Foley, assessed punishment at sixty to eighty-five years' imprisonment for each count. The trial court ordered Foley to serve all five sentences concurrently.

After sentencing, the State informed Foley's attorney that its DNA expert, Morris, had previously been reprimanded for quality-control issues related to her laboratory work.[2] Foley moved for a new trial on the basis that Morris's work history constituted material, favorable evidence that the State had failed to disclose in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (establishing that due process requires prosecutors to disclose material, exculpatory evidence to defendants). The trial court rejected this argument, ruling that the State had not been legally obligated to turn over evidence of Morris's work history.

Foley appeals.

---

[2] The State informed Foley's attorney of this fact via a mass e-mail sent to members of the criminal defense bar. The e-mail's purpose was to inform the criminal defense bar that the Austin Police Department had received a complaint about Morris's work and subsequently conducted an investigation. The State's e-mail transmitted the report that resulted from the investigation along with several related documents.

## DISCUSSION

Foley presents three issues:

1. "Whether the State's failure to disclose favorable evidence regarding errors and contamination issues in the work of its DNA analyst violated Appellant's right to due process;"

2. "Whether the Trial Court erred in admitting testimony from the State's expert regarding gunshot residue analysis"; and

3. "Whether conviction for two separate counts of aggravated robbery arising out of a single criminal transaction involving a single victim violated Appellant's right to be free from double jeopardy."

We will address these issues in turn.

### First Issue:  Disclosure of **Brady** *Materials*

Foley argues that the trial court erred by denying his motion for new trial because, under *Brady*, the State violated his due-process rights when it failed to disclose evidence concerning errors and contamination issues in the work that DNA analyst Morris performed in other cases.

#### Standard of Review

We review a trial court's ruling on a motion for new trial using an abuse-of-discretion standard. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007).  We view the evidence in the light most favorable to the trial court's ruling and uphold the ruling if it was within the zone of reasonable disagreement. *Id*. A defendant need not establish reversible error as a matter of law before the trial court may exercise its discretion to grant a motion for new trial, but trial courts do not have discretion to grant a new trial unless the defendant demonstrates that the first trial was

5

seriously flawed and that the flaws adversely affected his substantial rights to a fair trial. *See State v. Herndon*, 215 S.W.3d 901, 909 (Tex. Crim. App. 2007).

### *Analysis*

After Foley was convicted, the State informed his attorney that Morris had several documented incidents of contamination in her work on other cases and had twice been subject to periods of heightened monitoring by her supervisor as a result. Most of these incidents (and both of the periods of heightened monitoring) occurred in the two years before Morris worked on Foley's case, but one incident occurred after Morris worked on Foley's case. It is undisputed that the State possessed evidence of Morris's work history before trial. The question presented to the trial court was whether, under *Brady* and its progeny, the State's failure to disclose that evidence entitled Foley to a new trial. We hold that the trial court did not abuse its discretion by answering that question in the negative.

To establish entitlement to a new trial based on a *Brady* violation, a defendant must show that: (1) the State failed to disclose evidence; (2) the undisclosed evidence is favorable to him; and (3) the undisclosed evidence is "material," i.e., "there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different." *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002). A "reasonable probability" exists if the likelihood of a different outcome is sufficient to undermine confidence in the verdict. *See Lagrone v. State*, 942 S.W.2d 602, 615 (Tex. Crim. App. 1997), *cert. denied*, 522 U.S. 917 (1997). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Hampton*, 86 S.W.3d at 612 (quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)). In

6

reviewing the trial court's determination of whether the undisclosed evidence was material, we examine the entire record. *Lagrone*, 942 S.W.2d at 615.

Here, Foley failed to establish a reasonable probability that the outcome of his trial would have been different if the State had disclosed the evidence of Morris's work history. We reach this conclusion for several reasons. First, while the State used Morris to establish that Foley's DNA was found on a shirt discovered near the crime scene and that Foley could not be ruled out as a source of DNA found on the black gloves discovered near the crime scene, Morris was not the State's only witness; the State also offered incriminating testimony from Foley's accomplice (Price) and a former employer (Davis). Second, Foley's attorney had access to all of Morris's records in this case and a full opportunity to cross-examine Morris regarding her work in this case. Third, the head of the DNA lab where Morris worked, Cassie Carradine, testified at the hearing on Foley's motion for new trial that incidents of contamination are normal in labs and do not necessarily compromise final test results. Carradine testified that when contamination occurs, DNA analysis is repeated to ensure sound results. Thus, even in the other cases where Morris's work did contain errors, those errors did not necessarily lead to unreliable final test results. Furthermore, Carradine testified that her lab uses multiple failsafe procedures to ensure the accuracy of every analysis and is regularly audited by outside monitors. She also testified that multiple analysts double-checked Morris's work in the present case and found it to be error-free, and there was no evidence from any source that Morris's work in this case might have contained errors or been contaminated. Indeed, Carradine evaluated Morris's work as "above average" at the time Morris worked on this case. In light of all these facts, it was reasonable for the trial court to conclude that the undisclosed evidence of Morris's

7

work history did not entitle Foley to a new trial.  *See Hampton*, 86 S.W.3d at 612.  We overrule Foley's first issue.

### Second Issue:  Admission of Expert Testimony Concerning Gunshot-Residue Analysis

Next, Foley argues that the trial court erred by admitting expert testimony concerning gunshot-residue analysis because the State failed to establish that the testimony was reliable.

#### Standard of Review

We review a trial judge's decision on the admissibility of evidence for abuse of discretion.  *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim App. 2011).  We will not reverse a decision that is within the zone of reasonable disagreement.  *Id*.

#### Analysis

The admission of expert testimony is governed by Texas Rule of Evidence 702, which states:  "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  Tex. R. Evid. 702.  For expert testimony to be admissible under this rule, the party offering the testimony must demonstrate by clear and convincing evidence that the testimony "is sufficiently reliable and relevant to help the jury in reaching accurate results."  *Tillman*, 354 S.W.3d at 435 (quoting *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)).  In other words, the proponent of the testimony must prove that it is (1) based on a reliable scientific foundation and (2) relevant to the issues in the case.  *Id*.

The focus of a court's reliability analysis is to determine whether the evidence is based in sound scientific methodology. *Id*. at 435-36. Factors that could affect a reliability determination include but are not limited to: (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community; (2) the qualifications of the expert testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person who applied the technique on the occasion in question. *Id*. at 436 n.7.

During trial, the State called gunshot-residue expert Juan Rojas to testify about the gunshot residue that he found on the black glove that police discovered near the crime scene. Foley requested and obtained a "gatekeeping" hearing to test the reliability of Rojas's proposed testimony. *See Coble v. State*, 330 S.W.3d 253, 273 (Tex. Crim. App. 2010) (upon request, trial judge must conduct "gatekeeping" hearing outside jury's presence to determine whether proffered scientific evidence is sufficiently reliable). At the hearing, Rojas explained the methodology he had employed to test the glove for gunshot residue. He stated that the methodology: (1) is recognized and generally accepted by the scientific community; (2) is supported by a scientific theory that has been proven valid; (3) has been found to be an accurate way of testing for gunshot residue; (4) relies on "hard sciences" (chemistry in particular); (5) has proven accurate in his own experience; and (6) has had its accuracy established by published books and articles.

Foley argues that Rojas's testimony was insufficient to establish the reliability of Rojas's methodology because although Rojas asserted generally that his methodology was supported

by the scientific literature, Rojas "failed to produce or even name any studies, researchers, or writings to support his assertions." Foley seems to argue, in other words, that Rojas could establish the reliability of his methodology only by giving specific "authors, titles, or other identifying information" of scientific literature supporting his methodology.

Foley did not make this argument below. He therefore failed to preserve error. *See* Tex. R. App. P. 33.1(a); *Acevedo v. State*, 255 S.W.3d 162, 167 (Tex. App.—San Antonio 2008, pet. ref'd) (to preserve error, objection to expert testimony on basis of reliability must detail particular deficiency that makes expert's opinion unreliable); *Chisum v. State*, 988 S.W.2d 244, 250-51 (Tex. App.—Texarkana 1998, pet. ref'd) (same). But even if Foley had preserved error, we would still reject his argument. Although Rojas did not provide specific citations for the literature that supported his methodology, he testified that such literature exists. *See Kelly*, 824 S.W.2d at 573 (factors affecting trial court's determination of reliability may include *existence* of literature supporting or rejecting the underlying scientific theory and technique). Foley does not cite any authority, nor do we know of any, stating that an expert must name specific published works to establish the reliability of his methodology. *Cf. id*. Furthermore, Rojas gave the names of several reputable law-enforcement agencies that have approved and employed his methodology, including the American Society of Crime Laboratory Directors and crime labs in Bexar County, the United States Army, and the United Kingdom. *See id*. (factors affecting trial court's determination of reliability may include extent to which underlying scientific theory and technique are accepted as valid by relevant scientific community). Thus, even if he did not cite specific published works, Rojas provided multiple bases on which the trial court could reasonably conclude that Rojas's

methodology was reliable and had, in fact, been vetted by the scientific community. *See Tillman*, 354 S.W.3d at 435-36. We overrule Foley's second issue.

### *Third Issue: Double Jeopardy*

Finally, Foley argues that the trial court violated the prohibition against double jeopardy by trying him for two counts of aggravated robbery of Chaney and two counts of aggravated robbery of Barker. He claims that as a matter of law, he could only commit one count of aggravated robbery against each victim.

#### *Standard of Review*

The Double Jeopardy Clause of the United States Constitution provides that no person shall be subjected to twice having life or limb in jeopardy for the same offense. U.S. Const. amend. V. This clause protects against multiple punishments for "the same" offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977); *Ex parte Cavazos*, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006). The key factor in determining whether two offenses are "the same" for double-jeopardy purposes "is whether the legislature intended to allow the same conduct to be punished" twice. *Bigon v. State*, 252 S.W.3d 360, 371 (Tex. Crim. App. 2008).

#### *Analysis*

The indictment alleged that Foley committed two counts of aggravated robbery of Chaney and two counts of aggravated robbery of Barker. *See* Tex. Penal Code Ann. § 29.03 (West 2011) (defining offense of aggravated robbery). For each victim, one count alleged bodily injury and one count alleged threat. *See id.* § 29.03(a)(2) (person commits aggravated robbery if, in course of committing theft, he uses or exhibits a deadly weapon and (1) "intentionally, knowingly,

11

or recklessly causes bodily injury to another" or (2) "intentionally or knowingly threatens or places another in fear of imminent bodily injury or death."), *see also id.* § 29.02 (West 2011) (defining offense of robbery).

In a "situation in which two offenses from the same statutory section are charged," double-jeopardy analysis turns on the "allowable unit of prosecution." *Bigon*, 252 S.W.3d at 371-72; *see also Cavazos*, 203 S.W.3d at 336 ("The legislature . . . determines whether offenses are the same for double-jeopardy purposes by defining the 'allowable unit of prosecution.'") (internal citations omitted). The "allowable unit of prosecution" is "a distinguishable discrete act that is a separate violation of the statute." *Ex parte Hawkins*, 6 S.W.3d 554, 556 (Tex. Crim. App. 1999). The legislature has not explicitly identified the allowable unit of prosecution for robbery, but the court of criminal appeals has held that "the allowable unit of prosecution for robbery is each victim." *Id*. at 561. Although this holding superficially suggests that Foley could not be convicted of more than one robbery per victim, there is more to the story.

It is important to bear in mind *why* the court of criminal appeals in *Hawkins* held that "the allowable unit of prosecution for robbery is each victim." It did so because (1) "robbery is a form of assault" and (2) "the allowable unit of prosecution for an assaultive offense is each victim." *Id*. at 560. Because robbery is a form of assault, the logic that governs "assaultive offenses" governs robbery as well. *See id*. ("Since robbery is a form of assault, the allowable unit of prosecution for robbery should be the same as that for an assault.").

That being the case, we treat injury and threat not merely as different means of committing a single robbery offense, but rather as entirely different offenses. *See Woodard v. State*, 294 S.W.3d 605, 608 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) ("[T]he robbery statute

12

provides two separate, underlying robbery offenses—robbery causing bodily injury and robbery by threat."); *see also Gonzales v. State*, 191 S.W.3d 741, 747-48 (Tex. App.—Waco 2006, pet. ref'd) (aggravated assault by injury is "separate and distinct" offense from aggravated assault by threat); *Marinos v. State*, 186 S.W.3d 167, 175 (Tex. App.—Austin 2006, pet. ref'd) ("[A]ggravated bodily injury assault and aggravated assault by threat are different statutory offenses, not just two methods of committing the single offense of aggravated assault."). Treating robbery involving injury and robbery involving threat as separate offenses accords not only with the case law governing assault, but also with the rule that "[a]bsent an explicit [legislative] statement that 'the allowable unit of prosecution shall be such-and-such,' the best indicator of legislative intent regarding the unit of prosecution is the gravamen or focus of the offense." *Harris v. State*, No. PD-0945-10, 2011 Tex. Crim. App. LEXIS 1510, at *10-11 (Tex. Crim. App. Nov. 9, 2011). Robbery by injury and robbery by threat have different gravamens—"[b]odily injury [robbery] is a 'result of conduct' offense," whereas robbery "by threat is a 'nature of conduct' offense." *Marinos*, 186 S.W.3d at 174 (comparing aggravated assault by injury with aggravated assault by threat).

Because aggravated robbery involving injury and aggravated robbery involving threat are distinct offenses, the trial court did not violate the prohibition against double jeopardy by punishing Foley for both under these facts. *See Bigon*, 252 S.W.3d at 370. But even if aggravated robbery involving injury and aggravated robbery involving threat were the same offense, a double-jeopardy violation would still not be clear on the facts of this case. This conclusion rests on two legal principles. First, because Foley did not raise the double-jeopardy issue below, it warrants reversal only if error is apparent from the face of the record. *See Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). Second, a court may legally impose multiple punishments for the same

13

offense if the defendant has committed multiple discrete criminal acts. *See Gonzales*, 191 S.W.3d at 748 ("The commission of 'multiple discrete assaults against the same victim' results in liability for separate prosecution and punishment for every instance of such criminal misconduct.") (quoting *Vernon v. State*, 841 S.W.2d 407, 410 (Tex. Crim. App. 1992)); *Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App. 1999) (each "separate and distinct act" constitutes "separate and distinct statutory offense," even if all acts "are violations of a single statute"); *Ex parte Goodbread*, 967 S.W.2d 859, 860 (Tex. Crim. App. 1998) ("For Double Jeopardy purposes, '[t]he same offense means *the identical criminal act*, not the same offense by name.'" (quoting *Luna v. State*, 493 S.W.2d 854, 855 (Tex. Crim. App. 1973))) (emphasis added).[3] Together, these principles entail that unless the record facially shows that Foley did not commit separate acts to support each of his convictions, we must affirm.

Having reviewed the record carefully, we conclude that it fails to facially show that Foley did not commit separate acts to support each of his convictions. It is important to bear in mind that because the trial court instructed the jury on the law of parties, Foley could be convicted legally for every offense that he or one of his accomplices committed. *See* Tex. Penal Code Ann. §§ 7.01, 7.02 (West 2011) (law of parties); *Miles v. State*, 259 S.W.3d 240, 251 (Tex. App.—Texarkana 2008, pet. ref'd) (no double-jeopardy violation where defendant was convicted of both deadly conduct and deadly-conduct-based felony murder because "[t]he particular course of conduct engaged in by [the defendant], or by a co-actor for whom [the defendant] was criminally responsible,

---

[3] Indeed, the court of criminal appeals has recently stated that "[s]eparate crimes of aggravated assault could be based upon separately inflicted instances of bodily injury[]" without regard to their temporal relation. *Johnson v. State*, No. PD-0068-11, 2012 Tex. Crim. App. LEXIS 479, at *16 (Tex. Crim. App. Mar. 21, 2012).

involved multiple distinct offenses under the deadly conduct statute"). That being the case, there was evidence that Foley brandished a weapon upon entering the house; this evidence supported both of Foley's convictions for robbery by threat. There was also evidence that as a separate action, Foley later shot Chaney after Chaney fled and was brought back into the house by Price; this evidence supported Foley's conviction for robbery involving injury of Chaney. Finally, there was evidence that Foley's accomplice Cooper beat Barker unconscious; this evidence supported Foley's conviction for robbery involving injury of Barker. *See Miles*, 259 S.W.3d at 251. Collectively, this evidence shows that distinct criminal acts may have supported Foley's convictions for robbery involving threat and robbery involving injury. *See Gonzales*, 191 S.W.3d at 748; *Vick v. State*, 991 S.W.2d at 833; *Ex parte Goodbread*, 967 S.W.2d at 860. This means that a double-jeopardy violation is not apparent from the face of this record. *See Gonzales*, 8 S.W.3d at 643. We must therefore overrule Foley's third issue.

## CONCLUSION

For the reasons stated above, we affirm the conviction.

_____

Jeff Rose, Justice

Before Justices Puryear, Rose and Goodwin

Affirmed

Filed: April 25, 2012

Do Not Publish

15