**AFFIRM; and Opinion Filed May 16, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00652-CR

### WILLIAM SIMONS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 422nd Judicial District Court
### Kaufman County, Texas
### Trial Court Cause No. 15-00125-422-F

## MEMORANDUM OPINION
Before Justices Fillmore, Stoddart, and Schenck
Opinion by Justice Fillmore

A jury found William Simons guilty of the murder of Roxie Quilter and assessed punishment of life imprisonment. In three issues, Simons asserts the trial court reversibly erred in allowing the State to introduce evidence during the guilt–innocence phase of trial concerning his prior conviction for assaulting Quilter and failing to submit to the jury instructions on the lesser-included offenses of aggravated assault and manslaughter. We affirm the trial court's judgment.

## Factual Background

On March 11, 2014, Quilter died of gunshot wounds inflicted by Simons, her long-time boyfriend with whom she lived. Simons was charged with murder.

Sergeant Phillip Stewart, a Kaufman County Sheriff's Office criminal investigator, testified that he arrived at the Kemp, Texas, crime scene at approximately 10:05 p.m. Quilter

was deceased and laying on the front porch of the mobile home she owned. Stewart learned there had been a 9-1-1 call from Simons at approximately 8:34 p.m. during which Simons stated to the police dispatcher that he had shot Quilter.

Stewart and Texas Ranger Victor Patton interviewed Simons after he had been taken to jail. The recording of that interview was introduced into evidence and played for the jury. In that interview, Simons stated he had contacted the police after he shot Quilter, and he was "guilty, otherwise I wouldn't have turned myself in." Simons indicated that Quilter had burned the hamburger patties she prepared for his dinner, and he and Quilter began to argue and were pushing and shoving one another. Quilter accused Simons of stealing radios out of her vehicles. Simons stated in the interview that "one thing led to another" and "it just got to the point where [he] had enough and something snapped." Although Simons did not think his life was in danger, he went to his room at the back of the mobile home, "got [his] pistol" (a nine millimeter semi-automatic handgun) from a nightstand, returned to the living room where Quilter was sitting and "shot her, plain and simple." Simons told Stewart and Patton that he "thought [he] was just going to threaten [Quilter]," but "[s]he got big mouth with him," and "things got out of hand." He thought he would threaten Quilter by shooting next to her chair, but "it came too close."

Simons stated in the interview that the first shot he fired struck Quilter in her arm. Quilter was seated and Simons was standing approximately three feet from her. Simons thought the bullet had not struck Quilter, but she fell to the floor and Simons saw blood. Quilter grabbed her phone but Simons took it away from her because he believed she was trying to call someone, perhaps the police.

Quilter crawled or backed out the front door onto the porch where she shouted "help, help, help." Simons followed Quilter as she backed out of the mobile home. Quilter was facing Simons with one or both hands raised when he shot her a second time. Simons stated Quilter

–2–

was fighting him, "as any person would do," and trying to get away from him. Simons told Stewart and Patton, "I shot her. I didn't give her a chance to run."

Although Simons stated shooting Quilter was not something he had been planning to do and was not "intentional," he told Stewart and Patton that the second time he shot Quilter was not an accident. Simons stated, "I'm guilty. That's all there is to it," and "I've got a conscience and it's a guilty conscience." Simons stated, "I know I killed her. I think I killed her. I'm guilty, no beating around the bush. I shot her and killed her. That's the only way to look at it, the only honest way to look at it."

Simons told Stewart and Patton that he was too scared to take Quilter's pulse after he shot her. After shooting Quilter the second time, Simons went back into the mobile home and called Quilter's daughter, Audra Harrington, to tell her what had happened. He also called his daughter, Shannon Evans, and his former employer, Phillip Davis.[1] It did not "really cross his mind" to call for an ambulance before he telephoned Harrington, Evans, and Davis, and he stated he did not know if Quilter was alive or dead while he was speaking with them. Simons stated he told each of them what he had done and that he thought Quilter was dead, although he was not certain. Simons asked what he should do, and the responses varied from a suggestion that he should turn himself in to a suggestion that he kill himself. Simons stated that he then placed a 9-1-1 call no more than fifteen minutes after he shot Quilter.

Stewart testified he did not observe any injuries to Simons, and Simons did not complain of any injuries sustained in his argument with Quilter. The nine millimeter semi-automatic handgun was the only weapon found in the mobile home. Based on his training, education, and experience, Stewart testified the purpose of a firearm is to inflict bodily injury or death, and the

---

[1] Although it is not clear, there is some indication in the record that Simons also may have called his sister, Sarah Orta.

nine millimeter handgun found at the scene was capable of inflicting serious bodily injury or death. Based on Stewart's investigation, Simons was charged with murder.

Harrington testified that at approximately 8:30 p.m. on March 11, 2014, she received a telephone call from Simons. Simons told Harrington he had killed Quilter, and Harrington became quite upset and threw her phone down. Harrington testified Quilter, who was required to wear braces on her legs due to a muscle and nerve disease, was not a physically strong woman.

Evans testified she received a phone call from Simons at approximately 8:30 p.m. on March 11, 2014. Simons was agitated and nervous and sounded very upset. Simons admitted to Evans that he had "done something" to Quilter. Simons's speech was slightly slurred and he stuttered; Evans could tell her father had been drinking. Evans was afraid Simons would harm himself. She urged him to call an ambulance for Quilter. Her phone conversation with Simons was very brief.

Davis, who had known Simons for thirty years as a friend and former employee, also testified regarding a telephone call he received from Simons at approximately 8:30 p.m. on March 11, 2014. Simons sounded upset and agitated. It was not unusual for Simons to drink alcohol at night and he was intoxicated. Simons was devastated about what had happened and did not blame the incident on anyone else. Davis was concerned that Simons might harm himself. Simons told Davis that he and Quilter were arguing about things that "had kind of come to a head." According to Davis, Quilter spoke her mind and was a "busybody" who liked a good argument. Davis testified that Simons, on the other hand, never complained or argued and "ain't never said a bad word" of which Davis was aware. Rather than argue, Simons would "just be quiet and walk away." When confronted with a mistake he had made, Simons would "try to explain, but he was very calm."

The 9-1-1 telephone call placed by Simons after his telephone calls to Harrington, Evans, and Davis, was introduced into evidence and played for the jury. On that recording, Simons stated he "just shot [his] girlfriend" and she's "definitely dead." When asked by the police dispatcher whether he meant to shoot Quilter, Simons responded, "Yes. We were fighting." Simons told the dispatcher that Quilter thought he was stealing radios out of her cars, and the argument escalated; both Simons and Quilter got mad. He stated Quilter "fought like a cat," and he went to get his gun. Simons informed the dispatcher that he had shot Quilter twice; he first shot Quilter in the mobile home and they fought all the way out to the front porch. He indicated to the dispatcher that he shot Quilter about twenty minutes before placing the 9-1-1 phone call.

Medical examiner Tracy Dyer, M.D., testified regarding the autopsy he performed on Quilter. Dyer testified that a firearm is capable of inflicting death or serious bodily injury and it is clearly dangerous to life to fire a projectile into a human body. According to Dyer, Quilter's cause of death was gunshot wounds. Dyer testified Quilter was either shot three times or was shot twice, with one of the bullets striking her twice; he believed it was likely Quilter was shot twice. A bullet entered the crease of Quilter's left thigh and abdomen and exited her left thigh. Another bullet passed through Quilter's sternum and trachea, struck the arch of her aorta, passed through her right lung, and exited the right side of her back. That bullet traveled in a trajectory from front to back, left to right, and downward. Dyer did not know the sequence of the gunshots, although the gunshot through the sternum was likely fatal and could have been immediately fatal. Dyer also testified about a gunshot wound on the palm of Quilter's left hand at the base of her thumb, which was consistent with Quilter holding her hand up when the bullet struck. The gunshot injury to Quilter's hand contained soot from firearm combustion which indicated the muzzle of the firearm was close to Quilter's hand when it was fired. A toxicology screen performed in conjunction with the autopsy indicated there were no drugs or alcohol in Quilter's

body at the time of her death. Dyer testified Quilter had no diseases that would have impeded her life span in the near future.

Simons testified his relationship with Quilter spanned over seventeen years. Quilter had a nerve and tissue disease that affected her ability to walk, for which she wore leg braces, and her fingers. Simons confirmed that Davis's description of Quilter's personality was accurate. Simons had noted a change in Quilter a couple of months before the incident: Quilter was forgetful; she would accuse Simons of taking items she was unable to find; and she accused Simons of having an affair. A day or two before the incident, Quilter drove Simons's truck into a mailbox and did not tell Simons about it. When Simons asked her about the damage to his truck, Quilter told him someone had caused her to drive off the road. The day of the incident, Quilter accused Simons of taking a radio out of her car.

Simons drank a six-pack or more of beer every day, but did not begin drinking beer before 5:00 p.m. Simons had consumed seven or eight beers on March 11, 2014. He stated he was intoxicated when he shot Quilter, although he acknowledged that at no time in the interview with Stewart and Patton did he tell them he had been under the influence of alcohol when he shot Quilter. Simons testified his argument with Quilter on March 11, 2014, resulted from a combination of things, including the fact he remained upset about the damage done to his truck when Quilter was driving it. The argument began after Quilter overcooked the hamburger patties she prepared for Simons's dinner. Simons told Quilter the hamburger patties were burned, and she said she would make more. But when Simons handed the burnt hamburger patties to her, Quilter threw them at him. The argument escalated to the point the couple was pushing and shoving one another in the living room of the mobile home. They then argued on the front porch of the mobile home and returned to the living room. Simons testified that as the argument continued to escalate, he snapped; he testified it was as though Quilter had "pushed that red

–6–

button" and he had never been that angry in his life. Quilter sat down in a chair in the living room, and Simons went to his room to retrieve his handgun.

According to Simons, he returned to the living room, pointed the gun at Quilter who was seated, "and it went off." Simons testified it was an accident, and he did not know the safety on the handgun was not engaged. Simons thought he shot Quilter in her arm. Quilter reached for her phone, but Simons grabbed the phone from her and threw it aside. Quilter fell to the floor and crawled backwards on her hands and feet to the front door. After reaching up to open the front door, Quilter crawled onto the front porch. Simons testified he thought Quilter "tripped" on a planter, and he "just come up there and shot her." Simons saw that Quilter's chest and abdomen were not moving, so he knew she was not breathing and was dead. Simons went back into the mobile home and called Harrington, Evans, and Davis and told them he had shot Quilter. He then placed a 9-1-1 call. At trial, Simons remembered telling the police dispatcher he had shot his girlfriend and he had probably killed her.

Simons admitted that shooting Quilter was unjustified. He testified that he intended to point the handgun at Quilter. He knew that if a handgun is pointed at a person and the trigger is pulled, death or serious bodily injury may result, and he was reasonably certain that the handgun could cause death if he fired it at Quilter. Simons acknowledged that, insofar as he knew the handgun could cause death, he knowingly caused Quilter's death when he fired the handgun at her on the porch of the mobile home. Simons acknowledged the reason he telephoned individuals after shooting Quilter and before placing a 9-1-1 call was he wanted to know how to "get out of" shooting Quilter. When asked if the reason he wanted to "get out of" the situation was because he had wrongfully shot Quilter in cold blood, Simons responded affirmatively.

Simons recalled Davis's testimony that Simons is mild mannered and meek and someone who avoided arguments and conflict. He acknowledged, however, that on September 24, 2001,

he pleaded guilty to assaulting Quilter. Although he was charged with assaulting Quilter by choking her, Simons testified he did not choke Quilter but instead had pulled her hair.

## Procedural Background

The jury found Simons guilty of murder. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) & (2) (West 2011). Simons pleaded true to a prior felony conviction for driving while intoxicated. The jury found Simon was not acting under the influence of sudden passion when he shot Quilter and assessed punishment of life imprisonment. *See id*. § 12.42(c)(1) (West Supp. 2015). Simons's motion for new trial was overruled by operation of law, and he filed this appeal.

## Admitting Evidence of Prior Assault

In his first issue, Simons contends the trial court violated rule of evidence 403 by permitting the State to introduce evidence during the guilt–innocence phase of trial that Simons had previously assaulted Quilter. Simons argues on appeal that any probative value of the evidence was substantially outweighed by unfair prejudice. *See* TEX. R. EVID. 403. The State responds that Simons did not preserve that issue for appeal because he made no rule of evidence 403 objection to admission of the evidence at trial.

### *Standard of Review*

We generally review the trial court's admission of evidence under an abuse of discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011); *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (admissibility of extraneous offense). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *Tillman*, 354 S.W.3d at 435. A trial court's decision to admit evidence of an extraneous offense is generally within the zone of reasonable disagreement if the evidence shows (1) the extraneous offense is relevant to a material, non-propensity issue, and (2) the probative

value of the evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *De La Paz*, 279 S.W.3d at 344.

*Discussion*

Outside the presence of the jury, the State apprised the trial court of its intention to question Simons about his September 24, 2001 conviction for a misdemeanor assault of Quilter. The State informed the trial court it was not seeking to introduce evidence regarding the prior assault to show Simons acted in conformity with bad character, *see* TEX. R. EVID. 404(b), but rather to controvert Davis's testimony, elicited by the defense, describing Simons as mild mannered and not desiring to argue, which left the impression Quilter would have been the aggressor in an argument, and to controvert Simons's testimony he had never been as angry as he was on the night he shot Quilter. Simons objected to questioning regarding the prior assault conviction, arguing that neither Davis's testimony nor Simons's testimony "opened the door" for the State to impeach Simons with a misdemeanor assault conviction that occurred over ten years previously.

Generally, to preserve error for appellate review, a party's objection must be sufficiently specific so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)); *see also* *Malone v. State*, 405 S.W.3d 917, 925 (Tex. App.—Beaumont 2013, pet. ref'd). A complaint on appeal must comport with the objection made at trial. *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *see also* TEX. R. APP. P. 33.1(a)(1)(A) (preservation of complaint for appellate review requires complaint to trial court by timely request, objection, or motion with sufficient

specificity to make trial court aware of complaint, unless specific grounds were apparent from context).

On appeal, Simons contends any probative value of the evidence of his prior conviction for assaulting Quilter was substantially outweighed by unfair prejudice. *See* TEX. R. EVID. 403. However, at trial, Simons's objections to that evidence were that neither the testimony of Davis nor Simons had "opened the door" to evidence controverting Simons's mild manner and avoidance of controversy and that the misdemeanor assault conviction was too remote in time to be admissible. Simons failed to preserve in the trial court a rule of evidence 403 objection that any probative value of the evidence was substantially outweighed by a danger of unfair prejudice. Accordingly, Simons forfeited this complaint on appeal by not properly preserving error at trial. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Clark*, 365 S.W.3d at 340 (appellant failed to preserve complaint for review when trial objection did not comport with issue raised on appeal); *see also Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g) (objecting party must make rule of evidence 403 objection, separate and distinct from rule of evidence 404(b) objection, to preserve rule 403 complaint on appeal).[2]

We resolve Simons's first issue against him.

### Lesser-Included Offenses of Aggravated Assault and Manslaughter

In his second and third issues, respectively, Simons contends the trial court erred by failing to submit to the jury instructions on the lesser-included offenses of aggravated assault and manslaughter. The State responds that Simons was not entitled to lesser-included offense instructions on aggravated assault or manslaughter because Simons admitted to committing the

---

[2] *See also Balderas v. State*, No. 05-14-00900-CR, 2015 WL 2329253, at *3 (Tex. App.—Dallas May 14, 2015, pet. ref'd) (mem. op., not designated for publication); *Burks v. State*, No. 05-13-00852-CR, 2014 WL 5141663, at *5 (Tex. App.—Dallas Oct. 14, 2014, no pet.) (not designated for publication).

offense as alleged in the indictment and there was no evidence in the record that Simons was guilty of only the lesser-included offense of aggravated assault or manslaughter.

*Standard of Review*

We apply the *Aguilar/Rousseau* test to determine whether an instruction on a lesser-included offense should have been given to the jury. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012) (citing *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007)).[3] The first step is to determine whether the lesser offense is included within the greater offense. *Id*. The State correctly concedes in this case that "manslaughter and aggravated assault by causing serious bodily injury or by causing bodily injury with use or exhibition of a deadly weapon are both theoretically lesser-included offenses of murder." *See id*. at 386 (manslaughter is lesser-included offense of murder); *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000) (manslaughter, criminally negligent homicide, and aggravated assault are lesser-included offenses of murder). Consequently, we proceed to the second step, which is to determine whether the evidence showed that if Simons is guilty, he is guilty only of the lesser offense of aggravated assault or manslaughter. *See Cavazos*, 382 S.W.3d at 382, 385; *McKinney v. State*, 207 S.W.3d 366, 370 (Tex. Crim. App. 2006) (second step requires evaluation to determine whether some evidence exists that would permit jury to rationally find that, if defendant is guilty, he is guilty only of lesser offense). This second step is a question of fact and is based on the evidence presented at trial. *Cavazos*, 382 S.W.3d at 383  The evidence must consist of "more than mere speculation—[the second step] requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id*. at 385. Although more than a scintilla of evidence may be sufficient to entitle a defendant to an instruction on a lesser-included offense, *Hall*, 225 S.W.3d at 536, the evidence produced must be

---

[3] *See Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985).

sufficient to establish the lesser-included offense as a "valid, rational alternative" to the charged offense. *Id*. (citing *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim. App. 1999)). If the evidence establishing a lesser-included offense also casts doubt on the greater offense, a lesser-included offense instruction allows the jury to vote for a rational alternative. *Forest*, 989 S.W.2d at 367. "While it is true that the evidence may be weak or contradicted, the evidence must still be directly germane to the lesser-included offense and must rise to a level that a rational jury could find that if Appellant is guilty, he is guilty only of the lesser-included offense." *Cavazos*, 382 S.W.3d at 385. We review a trial court's decision to submit or deny a lesser-included offense instruction for an abuse of discretion. *Threadgill v. State*, 146 S.W.3d 654, 666 (Tex. Crim. App. 2004).[4]

*Discussion*

<u>Aggravated Assault</u>

In his second issue, Simons contends the trial court abused its discretion by failing to include an instruction in the jury charge on the lesser-included offense of aggravated assault. A person commits assault when he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01(a)(1) (West Supp. 2015). An assault becomes an aggravated assault if the offender additionally "uses or exhibits a deadly weapon during the commission of the assault." *Id*. § 22.02(a)(2) (West 2011).

According to Simons, if evidence at trial would permit a jury to find he intended to cause serious bodily injury but did not intend to kill Quilter, he was entitled to a jury instruction of aggravated assault. However, Simons's own statements and testimony establish that he was not entitled to an instruction on the lesser-included offense of aggravated assault. Simons testified

---

[4] *See also Jackson v. State*, No. 05-12-01413-CR, 2014 WL 7476411, at *4 (Tex. App.—Dallas Dec. 31, 2014, pet. ref'd) (mem. op., not designated for publication).

that shooting Quilter was unjustified; he intended to point the handgun at Quilter; he knew that if one points a handgun at a person and pulls the trigger, it can cause death or serious bodily injury; and he was reasonably certain that the handgun could cause Quilter's death if he fired it at her. Insofar as he knew the handgun could cause death, Simons acknowledged he knowingly caused Quilter's death when he fired the handgun at her. Simons stated to Stewart and Patton that he shot Quilter "plain and simple." Although Simons stated shooting Quilter was not something he had been planning to do and was not intentional, he stated the second time he shot Quilter, it was not an accident. In the 9-1-1 telephone call, Simons told the police dispatcher he meant to shoot Quilter.[5]

Regardless of whether he intended to kill Quilter, Simons's testimony shows he intended to cause serious bodily injury to Quilter and that he committed an act clearly dangerous to human life. *See Jackson v. State*, 115 S.W.3d 326, 330 (Tex. App.—Dallas 2003), *aff'd* 160 S.W.3d 568 (Tex. Crim. App. 2005); *Smith v. State*, 881 S.W.2d 727, 735 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd); *see also Harrell v. State*, 659 S.W.2d 825, 827 (Tex. Crim. App. 1983) (appellant admitted shooting the deceased, but testified that he intended to hit the deceased in the arm; under penal code section 19.02(a)(2), appellant intended to cause serious bodily injury to the deceased and committed act clearly dangerous to human life that caused death of the deceased; because evidence showed appellant guilty of murder, it did not constitute evidence he was guilty of aggravated assault and it was not error to refuse charge on that offense). Because Simons's own statements and testimony establish he is at least guilty of murder under section 19.02(b)(2) of the penal code, the evidence would not permit a rational jury to find that if Simons is guilty, he is guilty only of aggravated assault. Therefore, Simons was not entitled to an

---

[5] Dyer testified a firearm is capable of inflicting death or serious bodily injury and it is clearly dangerous to life to fire a projectile into a human body. According to Dyer, the second shot fired by Quilter could have been immediately fatal.

instruction on aggravated assault and the trial court did not err by refusing to charge the jury on that offense. *See Jackson*, 115 S.W.3d at 330–31; *Jackson v. State*, 992 S.W.2d 469, 475 (Tex. Crim. App. 1999) (murder defendant is not entitled to an instruction on the lesser-included offense of aggravated assault when the evidence showed him, at the least, to be guilty of a homicide).[6]

We resolve Simons's second issue against him.

<u>Manslaughter</u>

In his third issue, Simons contends the trial court abused its discretion by failing to include an instruction in the jury charge on the lesser-included offense of manslaughter. Simons was charged with murder under two definitions of that offense in the penal code: a person commits the offense of murder if he (1) "intentionally or knowingly causes the death of an individual," or (2) "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011); *see also Rocha v. State*, 648 S.W.2d 298, 301 (Tex. Crim. App. 1982 [Panel Op.]) (op. on reh'g) (as relevant, the elements of murder were defined by section 19.02(b) of the penal code as: "1) a person; 2) who intentionally or knowingly causes the death of an individual; or 3) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual").

"Culpable mental states are classified according to relative degrees, from highest to lowest, as follows: (1) intentional; (2) knowing; (3) reckless; (4) criminal negligence." TEX. PENAL CODE ANN. § 6.02(d) (West 2011);[7] *see also id*. § 6.03(b) (West 2011) (person acts knowingly with respect to the result of his conduct when he is aware his conduct is reasonably

---

[6] *See also Harris v. State*, No. 05-03-00584-CR, 2004 WL 1447701, at *6 (Tex. App.—Dallas June 29, 2004, no pet.) (not designated for publication).

[7] "Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged." *Id*. at 6.02(e).

–14–

certain to cause the result). While the culpable mental state for the offense of murder is intentional or knowing conduct, the culpable mental state for the offense of manslaughter is reckless conduct that causes another's death. *Id*. § 19.04(a) (West 2011). Conduct is "reckless" when the actor "is aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id*. § 6.03(c).

Here, to be entitled to an instruction on manslaughter, there must be some affirmative evidence Simons did not intend to kill or cause serious bodily injury when he shot Quilter and some affirmative evidence from which a rational juror could infer Simons was aware of but consciously disregarded a substantial and unjustifiable risk that death would occur as a result of his conduct. *See id*. §§ 19.02(b)(1) and 19.04(a). Simons testified that he intended to point the handgun at Quilter. *See Godsey v. State*, 719 S.W.2d 578, 580 (Tex. Crim. App. 1986) (specific intent to kill may be inferred from use of a deadly weapon); *see also Cavazos*, 382 S.W.3d at 384. He further testified he knew that if one points a handgun at a person and pulls the trigger, it can cause death or serious bodily injury, and he was reasonably certain that his handgun could cause Quilter's death if he fired it at her. Simons testified that, insofar as he knew his handgun could cause death, he knowingly caused Quilter's death when he fired the handgun at her.

Simons testified the first time he shot Quilter, it was accidental. However, Simons's statements to Stewart and Patton and to the police dispatcher in the 9-1-1 telephone call negate recklessness. Simons also responded "yes" to the question at trial concerning whether he had wrongfully shot Quilter in cold blood. Simons's statements to the police dispatcher that he intended to shoot Quilter and to Stewart and Patton that the second time he shot Quilter was not an accident, and his response to questioning at trial that he had wrongfully shot Quilter in cold blood, do not rationally support an inference that Simons acted recklessly at the moment he fired the second shot which caused serious bodily injury to or death of Quilter. *See Cavazos*, 382

S.W.3d at 385. Further, the evidence is undisputed that, at least with regard to the second time he shot Quilter, Simons committed an act clearly dangerous to human life that caused Quilter's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(2).

Because the evidence did not establish manslaughter as a valid, rational alternative to the charged offense, Simons was not entitled to the requested jury instruction on the lesser-included offense of manslaughter. *See Cavazos*, 382 S.W.3d at 385. Simons failed to meet the second step of the *Aguilar/Rousseau* test because there is no evidence that would permit a rational jury to find that, if Simons is guilty, he is guilty only of the lesser offense of manslaughter. *See id*. at 386. We conclude the trial court did not abuse its discretion by refusing to instruct the jury on the lesser-included offense of manslaughter.[8] We resolve Simons's third issue against him.

## Conclusion

We have resolved Simons's issues against him. Accordingly, we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

150652F.U05

---

[8] In his appellate brief, Simons states he "was not precluded from submission of sudden passion at punishment. The record supports the submission of the lesser-included charge of manslaughter." To the extent Simons is arguing the trial court should have instructed the jury on manslaughter because there was evidence of sudden passion, we disagree. Sudden passion is not an element of manslaughter. *See* TEX. PENAL CODE ANN. § 19.04. Rather, it is a basis for punishment mitigation at sentencing. *Id*. § 19.02(d); *see also Castaneda v. State*, Nos. 01-14-00389-CR & 01-14-00390-CR, 2015 WL 6930466, at *6 (Tex. App.—Houston [1st Dist.] April 6, 2016, pet. ref'd) (mem. op., not designated for publication).



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WILLIAM SIMONS, Appellant

No. 05-15-00652-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 422nd Judicial District
Court, Kaufman County, Texas,
Trial Court Cause No. 15-00125-422-F.
Opinion delivered by Justice Fillmore,
Justices Stoddart and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 16th day of May, 2016.