**Affirmed and Memorandum Opinion filed March 17, 2020.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-18-00597-CR

---

**XAVIER DAVENPORT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 228th District Court
Harris County, Texas
Trial Court Cause No. 1462345**

---

## MEMORANDUM OPINION

Appellant Xavier Davenport appeals his conviction for murder. A jury found appellant guilty and assessed his punishment at 35 years in prison. In two issues, appellant contends that the trial court erred in (1) excluding from evidence a videotape that appellant contends showed the complainant's prior violent conduct, and (2) refusing to charge the jury on self-defense. We affirm.

## *Background*

Appellant was charged with the murder of Christopher Joseph, who died from a gunshot wound to the back of his head. Joseph's death occurred at an apartment where he and appellant both lived.

Harris County Sheriff's Deputy Adriel Hinojosa testified that on March 22, 2015, he responded to a report of a shooting at an apartment complex. When he arrived at the scene, he ordered the occupants of the apartment to come out with their hands up. When the apartment door opened, Hinojosa saw appellant hugging a woman who was crying hysterically. Hinojosa later determined that the woman was appellant's mother. Appellant had blood on his hands and clothes. Hinojosa handcuffed appellant and placed him in the back of a patrol car. Appellant stated multiple times that a demon was trying to get him. After placing appellant's mother in the back of another patrol car, Hinojosa discovered Joseph's body in the dining area of the apartment.

Rhonda Golden, appellant's mother, testified that on March 22, 2015, she was approached by two men, one of whom she recognized as a friend of appellant and Joseph. Without telling her why, the men took her to appellant's apartment and then left. In her trial testimony, she stated that when she entered the apartment, she saw Joseph lying on the floor, having apparently been shot. She further said that appellant was standing by the wall, but she did not remember if she saw a gun at that point. She called 911, and a recording of the call was played for the jury. During the call, Golden can be heard saying that someone was dead at the scene, and a male voice, purportedly appellant's, can be heard saying "she's lying." Later in the call, Golden said "he shot him." Golden additionally testified that appellant said something about demons and devils and she felt like there was something wrong with him. She said that she hugged her son when the police arrived because

2

she was afraid the police would do something to him.

Golden said that she did not remember much about that day and explained that she suffers from mental illness and memory loss. The prosecutor therefore asked her about portions of a statement she made to police officers on March 24, 2015, just two days after the shooting. In the statement, Golden told officers that one of the men who took her to appellant's apartment was named Vic or Rick and that she went to the apartment because appellant was "tripping." When she arrived, according to her statement, Golden saw appellant with a firearm in his hand standing over Joseph. Joseph was still alive at that time. Golden begged appellant not to shoot, but the gun went off. Joseph was face down, not saying anything. Appellant then hugged Golden and started talking about demons and devils.

Harris County Sheriff's Deputy Jesus Ortiz testified that he works in the department's crime scene unit. Ortiz noted that a Smith & Wesson .40 caliber pistol recovered a couple of feet from Joseph's body had blood splattered on the barrel and a spent casing still in the chamber. He explained that the casing could have remained in the gun if the weapon had been fired at point-blank range or if the shooter was holding the gun loosely when it fired. Ortiz further said that a rusty, neglected .38 special revolver was found in a couch at the apartment and a 9mm semi-automatic pistol was found inside a jacket pocket on another couch. Neither of those weapons appeared to have been recently fired. Other witnesses confirmed that the jacket in question belonged to Joseph. Ortiz took photographs of the scene, and he interpreted one photo as suggesting someone had left through a bedroom window because the photograph showed that items had been knocked outside the window and the window glass and locks were still intact, indicating no forced entry. Ortiz additionally acknowledged that he could not tell that the shooting of Joseph was a "justifiable homicide" from the pattern of blood spatter,

3

the position of Joseph's body, or the position of the gun.

Tammy Lyons, a firearms examiner with the Harris County Institute of Forensic Sciences, testified that a bullet fragment recovered from Joseph's head could have been fired from the Smith & Wesson pistol but could not have been fired from the other two pistols. She further stated that a spent casing found at the scene was fired in the Smith & Wesson.

Mary Eakin, a DNA analyst with the Harris County Institute of Forensic Sciences, testified about the testing of swab samples from the Smith & Wesson pistol. Three swabs were tested from the pistol trigger, grip, and barrel. Eakin stated that no conclusions could be reached about the source of DNA found on the trigger. Joseph was excluded as a possible contributor to DNA found on the grip. But there was a high probability that Joseph was the source of DNA found on the barrel.

LaQuetha Davis, Joseph's mother, testified that Joseph stayed at her apartment the night before he was killed. She also testified that he commonly carried a gun in his jacket pocket.

Harris County Sheriff's Deputy Michael Jones was the lead homicide investigator in this case. He testified that no firearms were found on Joseph and photographs of appellant taken shortly after the shooting did not show any injuries. Jones opined that appellant did not appear to have been in an altercation. Jones further testified that Victor Webb's cell phone was found near the window where someone apparently exited.

During trial, defense counsel sought to introduce into evidence a video recording that showed Joseph and others listening and dancing to music in the apartment where the shooting occurred. In the video, Joseph and others are holding

4

handguns, pointing them, and pretending to shoot. Also, in the video, Joseph appears in the jacket that was found at the scene of the shooting. Appellant does not appear in the video. The trial court excluded the video from evidence.

*Exclusion of Video Recording*

As stated, in his first issue, appellant contends that the trial court erred in excluding from evidence the video showing Joseph and others dancing and handling firearms. Appellant contends that the video shows Joseph's "prior violent acts and possession of a firearm" and therefore was admissible as evidence tending to show that Joseph was the first aggressor in the confrontation that led to his death and appellant acted in self-defense.

**Standards of Review.** We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard and will not reverse the decision if it is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). We review the trial court's decision in light of what was before the judge at the time the ruling was made and uphold the decision if it is reasonably supported by the record and correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

Evidence of specific conduct "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Tex. R. Evid. 404(b)(1). However, a criminal defendant may introduce evidence of a victim's prior specific violent acts for a non-character purpose, such as the victim's specific intent, motive for an attack on the defendant, or hostility. *Ex parte Miller*, 330 S.W.3d 610, 620 (Tex. Crim. App. 2009); *see also* Tex. R. Evid. 404(b)(2). In the present case, appellant sought to introduce evidence of specific conduct to demonstrate Joseph was the first aggressor. *See*

5

*Allen v. State*, 473 S.W.3d 426, 446 (Tex. App.–Houston [14th Dist.] 2015, pet. dism'd) ("[A] victim's prior acts of violence . . . may be admissible to clarify the issue of first aggressor if the proffered act explains the victim's ambiguously aggressive conduct."). In such cases, "[a]s long as the proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner other than demonstrating character conformity only, prior specific acts of violence may be admitted even though those acts were not directed against the defendant." *Torres v. State*, 71 S.W.3d 758, 762 (Tex. Crim. App. 2002). "The proper predicate for the specific violent prior act by the deceased is some act of aggression that *tends* to raise the issue of self-defense, which the violent act may then help clarify." *Torres v. State*, 117 S.W.3d 891, 895 (Tex. Crim. App. 2003) (emphasis in the original).

**Analysis.** Even assuming the video at issue in this case can be described as showing violent behavior—a conclusion we need not and do not reach in this opinion—appellant failed to provide the proper predicate for its admission because there was no evidence of an ambiguously or clearly aggressive action by Joseph to raise the issue of self-defense. *See id*.; *Allen*, 473 S.W.3d at 446.

Appellant makes the following arguments in support of his contention that the evidence raised the self-defense issue:

- There must have been a violent altercation between appellant and Joseph immediately prior to the shooting because someone (probably Victor Webb) left through the apartment's bedroom window rather than walking to the front door through the area where Joseph was shot.

- DNA recovered from the handgun suggests there may have been a struggle over the weapon, and Deputy Ortiz stated he could not tell that the shooting was justifiable from the pattern of blood spatter, the position of Joseph's body, or the position of the gun.

- Joseph's mother said that her son commonly carried a handgun and came to her house the night before his death.

- It is clear from the audio recording of the 911 call that appellant was distraught after the shooting, and appellant can be heard on the recording saying that his mother was lying.

- Appellant told his mother and Deputy Hinojosa that a demon was trying to get him.

We will address each assertion in turn.

Although there is evidence that someone, perhaps Webb, left the apartment through a window, there is no direct evidence as to why the person did so. Even if we assume that someone left through the window because of events occurring in the other room, there is nothing in the record to suggest that Joseph was acting aggressively or violently in any confrontation. Joseph was shot through the back of his head, and appellant's mother told police that she saw appellant shoot Joseph while standing above him. We otherwise have no information regarding what transpired between them before the shooting.

The fact that Joseph's DNA was found on the barrel of the handgun can be explained by the fact that Joseph's blood was on that part of the gun. Deputy Ortiz described the blood on the gun as "blood splatter" from Joseph's wound. There is no suggestion in the record that Joseph's DNA was on the gun due to a struggle over the weapon. Moreover, Ortiz's statement that he could not tell that the shooting was justifiable in no way suggests appellant acted in self-defense.

The mere fact that a person is known to regularly carry a gun is not evidence that the person acted aggressively or violently in a particular incident. *See, e.g., Gutierrez v. State*, 764 S.W.2d 796, 798 (Tex. Crim. App. 1989); *Cadoree v. State*, 810 S.W.2d 786, 791 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd). Likewise, the fact that Joseph may have come to his mother's house does not

7

indicate that Joseph was behaving aggressively or violently.

That appellant sounded distressed on the 911 call and said that his mother was lying during the call in no way suggests Joseph had acted aggressively or violently. Appellant may have been distraught, he may have been in denial, or he might not have wanted his mother to tell authorities what he had done. Appellant does not suggest that he referenced Joseph's conduct in any way on the phone call.

Lastly, appellant's statements that a demon was trying to get him do not suggest that Joseph behaved aggressively or violently. Appellant was likely speaking metaphorically, or he may have been experiencing trauma due to what had just occurred; regardless, there is no indication that appellant meant that Joseph was the "demon" trying to get him.

In short, none of the evidence appellant points to suggests that Joseph acted aggressively or violently in the incident leading to his death. Accordingly, appellant has not demonstrated that he laid the required predicate for admission of the video of prior conduct into evidence. *See Torres*, 117 S.W.3d at 895. We overrule appellant's first issue.

### *Jury Instruction on Self-Defense*

In his second issue, appellant contends that the trial court erred in refusing to instruct the jury on self-defense. A defendant is entitled to a self-defense jury instruction when the issue is raised by the evidence, "whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017). In evaluating the trial court's ruling, we view the evidence in the light most favorable to the defendant's requested submission. *Id*. A trial court errs in denying a self-defense instruction if there is some evidence, from

8

any source, that will support the elements of self-defense. *Id.* A person generally is justified in using deadly force against another in self-defense if, among other things, that person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful deadly force. *Hocko v. State*, No. 14-16-00959-CR, 2019 WL 6320218, at \*5 (Tex. App.—Houston [14th Dist.] Nov. 26, 2019, no pet. h.) (citing Tex. Penal Code §§ 9.31, 9.32).

In support of his assertion that he was entitled to a jury instruction on self-defense, appellant references the same evidence that he did in arguing that Joseph had acted aggressively or violently in the confrontation that led to his death. As discussed above, the cited evidence did not show that Joseph engaged in any aggressive or violent conduct. Based on the same analysis, we conclude that the evidence likewise did not raise the issue of self-defense; in other words, there was no evidence from any source indicating appellant reasonably believed deadly force was immediately necessary to protect himself against Joseph's use or attempted use of unlawful deadly force. *See Hocko*, 2019 WL 6320218, at \*5. Accordingly, we overrule appellant's second issue. *See Gamino*, 537 S.W.3d at 510.

We affirm the trial court's judgment.


/s/ Frances Bourliot
Justice


Panel consists of Justices Jewell, Bourliot, and Zimmerer.

Do Not Publish — TEX. R. APP. P. 47.2(b).

9